FILED ___ RECEIVED
___ ENTERED ___ SERVED ON
COUNSEL/PARTIES OF RECORD

**JUN 2 4 2011**

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

1  Ralph Stephen Coppola
   4785 Rio Pinar Drive
2  Reno, NV 89509
   Pro Se
3  775 827 2344

4
                        UNITED STATES DISTRICT COURT
5                       DISTRICT OF NEVADA - RENO                    DEPUTY

6  RALPH STEPHEN COPPOLA,          )   CASE NO.:    3:2011cv00074
           and                     )   DEPT. NO.:
7  DOES I to XX,                   )
           Plaintiffs              )   MOTION FOR PARTIAL
8                                  )   SUMMARY JUDGEMENT
           vs.                     )
9                                  )
   DARREN K. PROULX, LAND          )
10 RESOURCE INVESTMENTS,           )
   INC., LAND RESOURCE             )
11 MANAGEMENT, INC., and           )
   MARINA COMMERCIAL OFFICES, LLC) )
12         and                     )
   DOES I to XX,                   )
13         Defendants              )
   ----------------------------------

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-1-

1

## TABLE OF CONTENTS

2

3

4    I.   Introduction And Relief Requested.                                    6

5    II.  Facts Relevant To This Motion.                                        6

6

7    III. Plaintiffs Federal Claims Against Selling Defendants.                 18

8

9    IV.  Summary Judgment Standard.                                            18

10

11   V.   Argument And Citation Of Authority.                                   19

12   VI.  Conclusion.                                                           47.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

3

4

5                                          **Cases**

6    *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 249 (1986)          19

7
     *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)               19
8

9    *Church of the Holy Trinity v. United States*, 143 U.S. 457 (1892)   33

10   *S.E.C. v. C.M. Joiner Leasing Corporation*, 320 U.S. 344 (1943)    31, 32

11
     *SEC v. Howey Co.*, 328 U.S. 293, 299 (1946)                       33, 34, 39, 42
12

13                                                                       44, 45

14   *Tcherepnin v Knight*, 389 U.S. 332 (1969)                         33

15
     *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975)   33
16

17

18   *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980)   44

19   *Hocking v. Mayless Dubois*, 885 F.2d 1449 (1989)                  34

20
     *Reeves v. Teuscher*, 881 F.2d 1495 (9th Cir. 1989)               46
21

22   *Rivanna v. Thompson*, 840 F.2d 236 (4th Cir. 1988)               46

23   *SEC v. Glenn W. Turner Ent. Inc.* (9th Cir. 1973) 474 F.2d 476   39, 40, 44

24
     *S. E. C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (1974)    45
25

26   *S.E.C. v. Life Partners, Inc.*,  87 F.3d 536 (D.C. Cir. 1996)    45

27   *S.E.C. v Merch. Capital, LLC*, 483 F.3d 747 (11th Cir. 2007)     46

28   *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125 (9th Cir. 1991)   40

_S.E.C. v. Unique Financial Concepts, Inc.,_ 196 F.3d 1195 (11th Cir. 1999)     41

_Williamson v.Ttucker,_ 645 F.2d 404 (5th Cir 1981)     46

_Woodward v. Terracor,_ 574 F.2d at 1026     44


_Endico v. Fonte,_ 485 F. Supp. 2d 411 (S.D.N.Y. 2007)     46

_Timmreck v. Munn,_ 433 F.Supp. 396, 403 n. 4 (N.D.Ill. 1977)     44


_People v. Figueroa,_ 41 Cal.3d 714 (1986)     31, 34


_Leyva v. Superior Court,_ 164 Cal.App.3d 462 (1985)     34

_Moreland v. Department of Corporations,_ 194 Cal.App.3d 506 (1987)     34, 40


_D. K. Properties, Inc. v. Osborne,_ 143 Ga.App. 832 (1977)     45

**Statutes**

Fed. R. Civ. P. 56(c)     19

Fed. R. Civ. P. 56(e)     19

Securities Act of 1933 (codified at 15 U.S.C.A. §77a et. seq.)     21

Securities Exchange Act of 1934 (codified at 15 U.S.C.A. §78a)     21

Section 25010 of the California Corporations Code     19

Section 25110 of the California Corporations Code     19

1

Section 25019 of the California Corporations Code          21

2

Section 25300 of the California Corporations Code          19

3

4

**ARTICLES**

5

Washington and Lee Law Review , Summer 1994, Ribstein, Larry E.   33

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. **INTRODUCTION AND RELIEF REQUESTED.**

1. COMES NOW, Ralph Stephen Coppola, the named Plaintiff, herein, (hereinafter "Coppola") who hereby files this Motion for Partial Summary Judgment pursuant to Fed.R.Civ.P. 56, on all federal securities law claims filed by plaintiff Coppola against defendants Darren K. Proulx, Land Resource Investments, Inc., and Land Resource Management, Inc. (hereingafter jointly referred to as "Selling Defendants") in the first and second, and twenty sixth, twenty seventh and twenty eighth Causes of Action in this the First Amended Complaint in this action.

## II.   **Facts Relevant to This Motion**.

1. Selling Defendants, and each of them, have either admitted or failed to deny, each of the following:

2. Plaintiff Ralph Stephen Coppola  ("Coppola") is a resident of Nevada, residing in Reno, Washoe County, Nevada, and venue for this action should be in said county.

3. Plaintiff Coppola is uncertain as to the true identities and capacities of Plaintiffs named herein under the fictitious names of Does I through XX, and Plaintiff Coppola will amend this complaint when the same is ascertained.  Plaintiff Coppola is informed and believes, and on such basis alleges, that Plaintiffs Does I through V may have similar federal unregistered securities claims, securities advertising claims, and securities fraud claims, and other related claims, against Defendants Darren K. Proulx ("Proulx"), Land Resource Investments, Inc. ("LRI") and Does IV through XX (all jointly referred to herein as the "Selling Defendants," and, if the context so provides, singularly, as the "Selling Defendant") on the basis set forth below, with the resulting damages to them herein alleged.

4. One or more of Plaintiffs Does I through XX is or are residents of California, and states other than Nevada.

5. Defendant Proulx who, upon information and belief and therefore it is alleged, is a resident of Nevada, and that he resides in Sparks, Washoe County, Nevada, and venue for this action should be in said county.

6. Defendant LRI is a California Corporation, California Entity Number C2134278, doing business primarily in California, although the primary office of which is located in Sparks, Washoe County, Nevada, and venue for this action should be in said Washoe County, and the agent for service of process is Defendant Proulx, 325 Harbour Cove Drive, Suite 211, Sparks, NV 89434.

7. Defendant Land Resource Management, Inc. ("LRM") is a Nevada Corporation, Nevada Business ID NV 20051725983, doing business in and the primary office of which is located in Sparks, Washoe County, Nevada, and venue for this action should be in said county, and the agent for service of process is Defendant Proulx, 325 Harbour Cove Drive, Suite 211, Sparks, NV 89434.

8. Defendant Marina Commercial Offices, LLC. ("Marina") is a Nevada Limited Liabilty Company, Nevada Business ID NV 20071091794, doing business in and the primary office of which is located in Sparks, Washoe County, Nevada, and venue for this action should be in said county, and the agent for service of process is Defendant Proulx, 325 Harbour Cove Drive, Suite 211, Sparks, NV 89434.

9. Plaintiff Coppola is uncertain as to the true identities and capacities of Defendants sued herein under the fictitious names of Does VI through XX, and will amend this complaint when the same is ascertained. Plaintiff is informed and believed, and on such basis alleges, that Defendants Does VI through XX, contributed in some fashion and manner to the actions and damages herein alleged.

10. Upon information and belief, and therefore it is alleged that, Defendants, and each of them, were and are the agents, servants, representatives, employees and/or co-conspirators of each of the other Defendants herein, and were at all times acting within the course and scope of such agency, representation, employees and/or co-conspirators and with the permission and consent of each of said Defendants.

11. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Defendants, including Does V1 through XX , inclusive, were, at all times herein mentioned, acting in concert with, each and every one of the remaining Defendants.

12. Wherever appearing in this complaint, each and every reference to Defendants and to any of them, is intended to be and shall be a reference to all Defendants hereto, and to each of them, named and unnamed, including all fictitiously named Defendants, unless said reference is otherwise specifically qualified.

13. Selling Defendants were or still are in the business of selling to investors "LandBank" interests consisting of undivided Investments ("Investments or an "Investment, as the context requires).

14. The Selling Defendants describe LandBanking generally as "the process of buying and then holding real estate located in the path of urban growth for future sale."  LRI is engaged in a business that it characterizes as "making LandBanking available to the average person."

15. LRI purchases or options real estate that is typically used for farming, and which is located outside a major metropolitan area in California.   Upon information and belief, and therefore it is alleged that to date all subject real estate properties have been located in Lancaster, California which is located approximately sixty miles from downtown Los Angeles, California. Such real estate is then either further subdivided into sellable parcels or marketed by itself.   The marketed real estate shall be referred to as a "Property."

16. During the late 1990's, Defendant Proulx , who, upon information and belief, and thereupon it is alleged is, the current CEO and sole shareholder of both Defendants LRI and LRM, was a builder who did work on occasion for Richard "Dick" Ramsey ("Ramsey").   At some time during or before 1999, Ramsey incorporated Land Resource Concepts, Inc. ("LRC").   In 1999, the California Department of Real Estate ["DRE"] issued a Public Report to LRC allowing LRC to subdivide property located in California into a subdivision consisting of equal undivided interests (each such

undivided interest is an "Investment").  Shortly thereafter, Ramsey sold LRC to Proulx.  Thereafter LRC was renamed LRI.

17. Upon information and belief, and thereupon it is alleged, that as of the time of fling, LRI   has sold to more than 1,400 individual Investors holding approximately 2,000 Investment interests in approximately 17 projects.

18. Further,  which it then offers for sale (the "Real Estate Sale") to third party individuals and entities ("Potential Investors").   Selling Defendants·represent that by purchasing an Investment, individuals are able to participate in LandBanking a much larger piece of real estate than they might otherwise be able to afford based solely upon their individual buying power.

19. Upon information and belief, and thereupon it is alleged, that such Investments are sold pursuant to public reports issued by the California Department of Real Estate, and, on and after late 2009, but not before, under an exemption from registration under Nevada Law.

20. Upon information and belief, and thereupon it is alleged, that no such Investment is sold in compliance with California's securities laws.

21. Upon information and belief, and thereupon it is alleged, that the advertising of such Investments does not comply· with the requirements of federal law for the advertising of securities.

22. Upon information and belief, and thereupon it is alleged, that the advertising of such Investments does not comply with the requirements of California law for the advertising of securities.

23. Upon information and belief, and thereupon it is alleged, that prior to late 2009, the sale of such Interests in Nevada was without compliance with Nevada's subdivision laws.

24. Upon information and belief, and thereupon it is alleged, that no such Investment is sold in compliance with Nevada's securities laws.

25. Originally LRC and then LRI both sold the Investments to the Investors, and then, after the close of escrow for each Property, also managed the respective corporation

created by LRI to manage each respective Property and the Investors who hold Investments in such Property (such corporations shall be referred to as an "Association," or jointly as "Associations").

26. Upon information and belief, and therefore it is alleged, that the Associations include but may not be limited to the following (with date of incorporation in California set forth in parenthesis): Cal Land Resources I Association, Inc. (03/02/1999), California Land Resources II Association, Inc. (03/02/1999), Cal Land Resources III Association, Inc. (03/02/1999), Cal Land Resources IV Association, Inc. (03/22/2001), Cal Land Resources V Association, Inc. (03/22/2001), Cal Land Resources VI Association, Inc. (03/22/2001), Cal Land Resources VII Association, Inc. (03/22/2001), Cal Land Resources VIII Association, Inc. (01/12/2004), Cal Land Resources IX Association, Inc. (01/12/2004), Cal Land Resources X Association, Inc. (01/12/2004), Cal Land Resources XI Association, Inc. (01/12/2004), Cal Land Resources 033 Association, Inc. (09/28/2005), Cal Land Resources 034 Association, Inc. (09/28/2005), Cal Land Resources 008 Association, Inc. (12/08/2005), Cal Land Resources 1011 Association, Inc. (12/08/2005), Cal Land Resources 027 Association, Inc. (01/25/2006), Cal Land Resources 073 Association, Inc. (04/04/2007), Cal Land Resources 1718 Association, Inc. (10/10/2007 ~ Dissolved), Cal Land Resources 1920 Association, Inc. (10/10/2007 ~ Dissolved), Cal Land Resources 009 Association, Inc. (04/04/2008).

27. In approximately 2010, LRM commenced management of the Associations, from LRI.

28. LRI adopts and records certain Covenants, Conditions and Restrictions ("CC&Rs") that are appurtenant to a Property.   LRI then applies to the California Department of Real Estate ("DRE") for permission to subdivide a Property into an undivided interest real estate subdivision consisting all the Investments which constitute a Property. LRI files appropriate application documentation with the DRE seeking authority from the DRE to sell the Investments; when the application is approved, the DRE issues a Public Report authorizing the sale of the Investments.  LRI acts as an incorporator and files Articles of Incorporation for a California Non-Profit Mutual Benefit

Corporation (an Association"); the purpose for each Association is to allow the purchasers of the Investments a mechanism for them to coordinate the management of all Investments which constitute each Property.  As the incorporator of each Association, LRI adopts bylaws for such Association.  California licensed real estate brokers sell the Investments to third parties and the proceeds from such sales are deposited into a licensed escrow until 60% of the Investments in a Property are sold, at which time there is a close of escrow.  From 2009 and thereafter, the 60% threshold was lowered.  After the first close of escrow there are subsequent closes of escrow as additional sales are achieved for each Property, until 100% of the Investments for that Property have been sold).  Upon a close of escrow, each purchaser of an Investment ("Investor") in that escrow receives a separate grant deed to such Investor's Investment, which is guaranteed by a standard CLTA policy of title insurance.

29. Upon information and belief, and thereupon it is alleged, that historically, the average price to purchase an Investment has been in the $5,000 to $20,000 range, although the Investments for the initial Properties sold for less, resulting in gross initial investment from the Investors and gross proceeds to the Selling Defendants of approximately $14,000,000.00 to $20,000,000.00.

30. By virtue of the CC&Rs, each Investment includes one membership interest in the respective Association.  The Investors use the respective Association to provide and coordinate certain services such as paying property taxes, buying insurance, paying for accounting and tax services, keeping a Property free of weeds, leasing the Property and determining if and when to sell a Property.  The owners are responsible to pay a pro-rata share of the dues of the Association. The CC&Rs specifically preclude the Investors, respective Association, or any other party from developing or improving a Property in any way, or from otherwise enhancing a Property's value.  It is strictly to be held in the same condition that existed as at the time of acquisition from LRI.  However, in the case of one LandBank, LandBank III,

after holding the parcel for a few years, 100% of the Investors voted to change the bylaws and CC&Rs to allow for seeking final map status.

31. Each Association provides an organizational structure for the Investor to sell the entire Property (i.e. sixty percent of the Investors may elect to sell the entire Property) rather than just their individual Investment.

32. The Association for each Property is theoretically independent of the Associations for each other Property, but in practice they have been jointly managed by the Managing Defendants, with the exception of a Property known as Land Bank III, which has required and received additional separate management.

33. Historically, all of the Associations have retained LRI to manage the Properties and Associations, such as the collection of dues, the payment of property taxes and the planning of the annual meetings; however, the are theoretically free to engage any entity to perform such functions or to perform them "in house," but in practice, Defendant Proulx so controls the voting that there has not been a change away from his companies as managers.

34. LRI, as incorporator of each Association, adopts the original Bylaws for each Association. As set forth in Section 1.21 of the Declaration of Covenants, Conditions and Restrictions ("CC&Rs), and incorporated into the Bylaws, Section 1.4 of the Bylaws, the Members of Record of the Association consist of "any person, firm, corporation or other entity in which title to a Property Interest is vested as shown by the Official Records of the Office of the County Recorder."

35. While LRI time of the final closing for a Property, LRI has sold all Investments to third parties and so owns no interest in a Property, in practice, after close of escrow, LRI, as a beneficiary of a mortgage, reacquires a Investments through foreclosure when an Investor has failed to make their monthly payment as outlined in the purchase promissory note. After the close of escrow for a Property, the Members may amend the Bylaws (Section15.4).

36. "Subject to the provisions of the California Nonprofit Mutual Benefit Corporation Law, and applicable Regulations of the [DRE] and any limitations contained in any of

the Governing Documents relating to action required to be approved by the Members, the business and affairs of the Association shall be vested in and exercised by, the Association's Board of Directors." (Section 7.1). The "Board may delegate the management of the activities of the Association to any person or persons, management company or committee, provided that notwithstanding any such delegation the activities and affairs of the Association shall continue to be managed and all Association powers shall continue to be exercised under the ultimate direction of the Board." (Section 7.1). The Board may "[a]ppoint such agents and employ such other employees, including attorneys and accountants, as it sees fit to assist in the operation of the Association, and to fix their duties and to establish their compensation." (Section 9.1(c)). "The Board may, from time to time, employ the services of a manager to manage the affairs of the Association and, to the extent not inconsistent with the laws of the State of California, and on such conditions as are otherwise deemed advisable by the Board, the Board may delegate to the manager any of its day-to-day management and maintenance duties and powers under these Bylaws and the Declaration, provided that the manager shall at all times remain subject to the general control of the Board." (Section 15.1).

37. However, in practice Defendant Proulx has acquired at least one Investment in each Property and until the shareholders meeting held in 2009, had been the sole president of each Association and controlled the Directors of each Association.

38. Section 3.1, entitled, <u>Purposes and Powers</u>, "[t]he Association is formed to provide a mechanism to acquire the Property, assess the Members the requisite amounts to maintain the Property and pay the real estate taxes and assessments. The Association shall have neither power nor authority to improve the Property or to develop the Property."

39. Each purchaser of a Interest receives a traditional grant deed evidencing the ownership of a Investment in a Property. Each grant deed is recorded with the county upon close of the purchase escrow. Each grant deed gives the Association an irrevocable power of attorney with regard to purchaser's Investment. The purpose

of the irrevocable power is to allow for an orderly and timely transfer of ownership of 100% of the Investments in a particular Property upon the vote of the super majority of members to sell.

40. A Property is generally leased as farm real estate after LRI's purchase. The initial lease is for five years at ONE DOLLAR ($1.00) per year with options to extend on a yearly basis thereafter. After the fifth year, the lease may be terminated if a Property is sold by an Association, but the tenant has certain rights to complete its operations for a given year.

41. California laws and regulations require purchasers of an Investment be afforded an opportunity to read the Public Report issued by the DRE for a Property. While the Public Report is provided by the DRE, by law it is neither a recommendation nor endorsement of the subdivision by the DRE; rather, it is for information purposes only. The Public Report is a summary of the material terms and conditions of the offer and sale of the Investments by LRI (the "Offering").

42. The Public Report for each Property contains, in a section entitled "Special Notes," discloses that a Property is undeveloped raw real estate and that "no representations may be made by subdivider or agent that a Property has investment merit, future appreciation potential or may be used for any purchase." It cautions potential buyers that a Property may be difficult to resell without proper marketing, that there may be competition with other undivided interest owners when the time to sell arrives, and that the 60% approval required to sell the real estate may be difficult to reach. The Public Report, however, does not contain most of the disclosures that would be required of a security offering.

43. The Public Report also informs potential buyers of their legal right to rescind the offer within three calendar days of signing the offer to purchase as provided by California law. It goes on to inform buyers that they will become members of the respective Association upon purchase and that the Profit Association will assess each Investment based on the budget prepared by LRI and submitted to the DRE as part of LRI's seeking authorization through the issuance of a Public report to sell the

-14-

Investments.  The Public Report notes that a Investment is subject to CC&Rs (discussed above).

44. While the Selling Defendants utilized newspaper ads, radio ads and other forms of advertising, the great majority of sales occurred through word of mouth advertising which was then  used to funnel potential Investors to dinner seminars at which the Investments were pitched.

45. Until approximately 2008 representations made to potential Investors explicitly included such representations as that the projects were a "proven plan of real estate investment" and having a "high future profit potential."

46. On April 29, 2008, The Department of Real Estate filed a complaint against LRI and its former attorney, now deceased, George R. Kucera, of advertising "between April 11, 2006 and on or about August 31, 2007," that included representations of the Subdivision being a "proven plan of real estate investment" and having a "high future profit potential," which advertising was "false and misleading," and constituted the substantial misrepresentation of material fact."  Upon information and belief, and thereupon it is alleged, that such time period was the time period during which LandBank 008 was for sale.

47. Upon information and belief, and thereupon it is alleged, that LRI was also accused of causing "to be published advertisements which included statements or representations that the [California Department of Real Estate] gave approval to [LRI] to sell said Subdivision [LandBank 008 - Avenue "I" and 65th Street East]."

48. On July 17, 2008, the California Department of Real Estate filed against LRI an Order to Desist and Refrain from "causing to be published advertisements which include statements or representations which are false, misleading or deceptive in violation of Section 11022 of the Code."

49. Effective on March 24, 2009, the matter was resolved by a Stipulation and Agreement which contained an Order of the Real Estate Commissioner whereby all "licenses and licensing rights of Respondent [LRI ...] are suspended for a period of

sixty (60) days" . . . but allowing for a buyout of the suspension and imposing a two year probation.

50. Upon information and belief, and thereupon it is alleged, that from and after 2008 Selling Defendants changed their public advertising to conform to the requirements of their real estate and subdivision licensing.

51. However, upon information and belief, and thereupon it is alleged, that from and after 2008 Selling Defendants also maintained a parallel and guarded advertising program that was shown only to certain trusted associates of LRI and potential purchasers of Investments.

52. Upon information and belief, and thereupon it is also alleged, that from and after some date in the 1990s, through the current date, Selling Defendants allowed certain salespeople and their associations to maintain websites not utilizing the name of the Selling Defendants, but which contained advertising material that was either or both prohibited by the California Department of Real Estate or which would constitute advertising of a security, and which were used to reach a broader audience and then funnel prospective purchasers to Selling Defendants.

53. Upon information and belief, and thereupon it is alleged, that as late at February 29, 2009, the Selling Defendants ran radio advertisements in which Defendant Proulx stated that the public reports allow a "unique ownership investment," that investors could make great profits in LandBanking, that an investment in land can result in impressive profits for the savvy investor and that the objective of LandBanking is appreciation in value of the land, all for the purposes of monetary gain by investors.

54. Upon information and belief, and thereupon it is alleged, that as late at February 29, 2009, the Selling Defendants ran video advertisements in which it the overriding theme is that Defendant LRI operates its LandBanking business so that purchasers of interests are investors, and that the purpose of investing in such business is to realize profit or appreciation, since "LandBanking is all about investment."

55. Upon information and belief, and thereupon it is alleged, that in making sales, specifically including sales for LandBank III, the Selling Defendants presented that the

land in Lancaster (where the Properties are located) would be a very productive "investment," because it was a developing expanding place, and that it is "it is best to buy 'now' so that it could be sold for the most profit."

56. Upon information and belief, and thereupon it is alleged, that at the time of the sale, the Selling Defendants, and, thereafter, the Defendant Proulx, consistently assured potential purchasers of the Investment that he would manage the property so that they would not have to worry about its management or management decisions.

57. An ongoing business enterprise exists. The capital that is used to conduct operations of the Association (i.e. pay taxes, insurance, accounting, etc.) is not part of any initial purchase of the Investments.. Rather, each of the Associations creates a budget and assesses members for their pro rata share of expenses. An individual Investor is powerless by himself or herself to affect the amount of dues that are imposed.

58. As stated, many of the Properties derive yearly lease income from a lease with a "farmer," which in fact is a major national carrot producer, which "farmer," sold the land to the Defendants in the first place.

59. For a majority of the period of time, under the bylaws and CC&Rs, LRI also had the legal authority to make any and all decisions even after the final close of escrow on the Investments due to the fact that at the time of purchase by the Majority Plaintiffs, LRI had the right to control the board and named Proulx as the President of each Association until 2009. Proulx was not voted in as President at the Investor meetings held in 2009 and 2010, but Proulx still effectively chose who would run for the boards, and, by controlling the majority of the votes through proxies, effectively solely determined who would be on the boards and in which offices.

60. Additionally, the Associations creates a pro rata sharing of expenses to maintain the entire respective Property. The Association also creates a pro-rata sharing of profits or proceeds, when the central purpose of the Investment is made: the ultimate disposition of the entire Property. This disposition can occur only if the Investors holding 60% of the Investments in a Property choose to sell an entire Property.

61. Selling Defendants denied the paragraph in which Plaintiff Coppola alleged ownership of an interest in LandBank 008, presumably due to a disagreement about the date of purchase, rather than about the ownership.

### III.   Plaintiffs Federal Claims Against Selling Defendants.

1. Selling Defendants, and each of them, participated in the sale of Interests to the general public, including to plaintiff Coppola, in violation of the requirements of the US Securities Acts to register such securities as a result of Selling Defendants being "promoters" by their acting as experts in the investment choice, controlling the investments once sold, and deriving continuing profit from the investments.

2. As a proximate result of the actions of Selling Defendants, Plaintiffs, and each of them, have been damaged in an amount to be proven at time of trial, which sum is in excess of the jurisdictional amount of this Court, and which include compensatory and punitive damages and legal fees.

3. Selling Defendants, directly or indirectly, by the use of any means, including instrumentalities of interstate commerce or of the mails, used or employed, in connection with the purchase or sale of the Interests, to plaintiff Coppola, manipulative or deceptive devices or contrivances in contravention of the rules and regulations as the Commissioner of the Securities and Exchange Commission has prescribed as necessary or appropriate in the public interest or for the protection of investors.

4. As a proximate result of the conduct of Selling Defendants as herein alleged, Plaintiff Coppola has incurred damages in at least the sum in excess of the jurisdictional amount of this Court, and additional amounts according to proof at time of trial, and which include compensatory and punitive damages and legal fees.

### IV. Summary Judgment Standard.

1. Summary judgment is appropriate when the movant can demonstrate that the pleadings, depositions, affidavits, and other evidence available to the court establish no genuine

issue of material fact. Fed. R. Civ. P. 56(c). Once the movant has met its burden, the nonmovant must demonstrate that there are fact issues warranting a trial. Fed. R. Civ. P. 56(e). In opposing summary judgment, the nonmoving may not rely on conclusory allegations in his pleadings; rather, he must set forth sufficient evidence supporting a claimed factual dispute to require a fact finder to resolve the parties' differing versions of the truth at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the nonmovant fails to make a showing on an element for which he bears the burden of proof, the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence must be viewed in a light most favorable to the nonmovant. Id.

## V.   **Argument and Citation of Authority.**

1. Selling Defendants is an "issuer" as defined by Section 25010 of the Corporations Code, with respect to the sale of such Real Estate Interests, is therefore not exempt from the qualification requirements of Section 25110.  As such, the advertising of such Real Estate Interests is subject to the provisions of Section 25300 of the Corporations Code.

2. Paragraph 24 of the Complaint was not denied:

   i. Upon information and belief, and thereupon it is alleged, that no such Investment is sold in compliance with California's securities laws.

3. Paragraph 25 of the Complaint was not denied:

   i. Upon information and belief, and thereupon it is alleged, that the advertising of such Investments does not comply with the requirements of federal law for the advertising of securities.

4. Paragraph 26 of the Complaint was not denied:

   i. Upon information and belief, and thereupon it is alleged, that the advertising of such Investments does not comply with the requirements of California law for the advertising of securities

5. Paragraph 27 of the Complaint was not denied:

i. Upon information and belief, and thereupon it is alleged, that prior to late 2009, the sale of such Interests in Nevada was without compliance with Nevada's subdivision laws.

6. Paragraph 28 of the Complaint was not denied:

i. Upon information and belief, and thereupon it is alleged, that no such Investment is sold in compliance with Nevada's securities laws.

## I.    LAND RESOURCE INVESTMENTS, INC. AND ITS PRODUCT

### A.    ENTITY STATUS

1. LRI is a California corporation which is also authorized to do business in Nevada as a foreign corporation.

### B.    THE PROPOSED "LANDBANKING" OFFERING GENERALLY

1. LRI describes LandBanking generally as the process of buying and then holding real estate located in the path of urban growth for future sale.  LRI makes "LandBanking" available to the average person.  By purchasing a Real Estate Interest (defined below), individuals are able to participate in LandBanking a much larger piece of real estate than they might otherwise able to afford based solely upon their individual buying power.   LRI has been in the business of LandBanking since its first project in 1999, all of which have been authorized by the California Department of Real Estate.

2. The current project of LRI is entitled LandBank 009.  LandBank 009 is Los Angeles County Assessors parcel number 3384-017-009, situated at 65th St E and Ave J-8, Lancaster, CA County of Los Angeles (the "Property").  LRI purchased the property from a related entity which purchased it from an unrelated third party (Boalthouse Farms).   LRI then applied to the California Department of Real Estate ("DRE") for permission to subdivide the Property into an undivided interest subdivision with 110 equal undivided interests (each such undivided interest is a "Real Estate Interest").

C.    **SUMMARY OF OPERATIONS**

        The operations of LRI, the documents provided to potential customers, the organizations created to serve customers who buy a Real Estate Interest and the operation of such organizations are summarized herein, together with the relevant statutes and case law and an analysis of why the Real Estate Sale is the offer or sale of a "security" as the term is defined in the Securities Act of 1933 (the "1933 Act" codified at 15 U.S.C.A. §77a et. seq.), the Securities Exchange Act of 1934 (the 1934 Act" codified at 15 U.S.C.A. §78a et. seq., and together with the 1933 Act, the "Acts") (with reference to the securities laws of California, including Section 25019 of the Corporations Code by analogy) (all such definitions are the "Securities Acts").

II.    **SUMMARY OF THE CURRENT LRI OFFERINGS**

        Before setting forth the various documents related to LandBanking and the sale of the Real Estate Interests, a brief summary is warranted.

        A.    LRI purchased the Property, which lies fallow (prior properties were farmed, and therefore, were leased back to the seller/farmer);

        B.    LRI filed the appropriate application documentation with the CA Department of Real Estate seeking authority from the DRE to sell the Real Estate Interests; the application has been approved, and the DRE has issued a Public Report authorizing the sale of the Real Estate Interests;

        C.    LRI adopted and recorded certain Covenants, Conditions and Restrictions ("CC&Rs") that are appurtenant to the Property, which were submitted and approved by the CA Department of Real Estate;

        D.    LRI has acted as an incorporator and filed Articles of Incorporation for a California Non-Profit Mutual Benefit Corporation entitled Cal Land Resources 009 Association, Inc. ("Non-Profit Association"); the purpose of the Non-Profit Association is to allow the purchasers of the Real Estate Interests a mechanism for them to manage their Real Estate interests, which articles were submitted and approved by the CA Department of Real Estate.

E.      As the incorporator of the Non-Profit Association, LRI adopted bylaws for the Non-Profit Association, which were submitted and approved by the CA Department of Real Estate;

F.      California licensed real estate brokers sell the Real Estate Interests to third parties and the proceeds from such sales are deposited into a licensed escrow company until 60% of the Real Estate Interests in the Property are sold, at which time there is a close of escrow;

        1.      After the first close of escrow (upon 60% sale of the Real Estate Interests), there  are subsequent closes of escrow as additional sales are achieved, until 100% of the Real Estate Interests have been sold).

        2.      No money is distributed to LRI except upon a close of an escrow.

G.      Upon a close of escrow, each purchaser of a Real Estate Interest receives a separate grant deed to his/her undivided fee simple ownership interest in the real estate guaranteed by a standard CLTA policy of title insurance;

H.      By virtue of the CC&Rs, each undivided fee simple ownership interest includes one membership interest in the Non-Profit Association;

I.      The owners of the Real Estate Interests in the Property will use the Non-Profit Association to provide and coordinate certain ministerial services such as paying property taxes, buying insurance, paying for accounting and tax services, and keeping the Property free of weeds.  The owners are responsible to pay a pro-rata share of the dues of the Non-Profit Association and the CC&Rs provide a mechanism for enforcing that;

J.      <u>The CC&Rs specifically preclude the owners, the respective Non-Profit Association, or any other party from developing or improving the Property in any way, or from otherwise enhancing the Property's value</u>.  It is strictly to be held in the same condition that existed as at the time of acquisition from LRI;

K.      Each owner may freely sell, transfer and/or assign his/her Real Estate Interest to any other party at any time without restriction;

L.      The Non-Profit Association provides an organizational structure and procedure for the owners to sell the Property (i.e. sixty percent of the Real Estate Interests may elect to sell the entire Property).  If they do so, all owners receive a pro-rata distribution of the proceeds from

such a sale, but the "profit" of each owner from their individual Real Estate Interest will depend upon their individual basis.

M.   The Non-Profit Association for the Property is independent of the non-profit associations for all other LRI projects.

N.   Historically, the non-profit associations have retained a company related to LRI, either LRI or Land Resource Management, Inc. ("LRM"), to perform ministerial functions for the non-profit associations, such as the collection of dues, the payment of property taxes and the planning of the annual meetings; however, the non-profit associations are free to engage any entity to perform such functions or to perform them "in house," and vote annually at well attended meetings to decide who will perform the minor ministerial duties.

O.   The Real Estate Interests are marketed by licensed real estate brokers and their licensed salespeople.  The purchase price is $18,500 per Real Estate Interest together with a $500.00 escrow fee, which is paid by LRI if the consumer uses Entrust as the escrow.   LRI estimates that some 80% of its sales are by referrals from prior purchasers of Real Estate Interests.  Although LRI has tried marketing through such things as radio ads and other mass media, it has found that word of mouth is the most productive marketing, and therefore, LRI primarily markets through referrals.  Consumers who then become interested in purchasing a Real Estate Interest are then invited to a dinner presentation.   Marketing materials are supposed to be approved by the California Department of Real Estate.

P.   Should a consumer purchase a Real Estate Interest, California law then gives him or her three days to rescind the purchase.

### III.   SUMMARY OF DOCUMENTS

### A.   BYLAWS

LRI, as incorporator of the Non-Profit Association adopted the original Bylaws for the Non-Profit Association.  As set forth in Section 1.21 of the Declaration of Covenants, Conditions and Restrictions ("CC&Rs), and incorporated into the Bylaws, Section 1.4 of the Bylaws, the Members of Record of the Non-Profit Association consist of "any person, firm, corporation or other entity in which title to a Property Interest is vested as shown by the Official Records of the Office of the County Recorder."  LRI is **NOT** intended to be a member of the Non-Profit

Association because, at the time of the final closing for the Property, LRI intends to have sold all Real Estate Interests to third parties and owns no interest in the Property.  In limited cases, after close of escrow LRI, as a beneficiary of a mortgage, may reacquire a Real Estate Interest through foreclosure if a client has failed to make their monthly payment as outlined in the purchase promissory note.  After the close of escrow for the Property, the Members may amend the Bylaws (Section15.4).

"Subject to the provisions of the California Nonprofit Mutual Benefit Corporation Law, and applicable Regulations of the Real Estate Commissioner of California and any limitations contained in any of the Governing Documents relating to action required to be approved by the Members, the business and affairs of the Association shall be vested in and exercised by, the Association's Board of Directors."  (Section 7.1).  The "Board may delegate the management of the activities of the Association to any person or persons, management company or committee, provided that notwithstanding any such delegation the activities and affairs of the Association shall continue to be managed and all Association powers shall continue to be exercised under the ultimate direction of the Board." (Section 7.1).  The Board may "[a]ppoint such agents and employ such other employees, including attorneys and accountants, as it sees fit to assist in the operation of the Association, and to fix their duties and to establish their compensation." (Section 9.1(c)).  "The Board may, from time to time, employ the services of a manager to manage the affairs of the Association and, to the extent not inconsistent with the laws of the State of California, and on such conditions as are otherwise deemed advisable by the Board, the Board may delegate to the manager any of its day-to-day management and maintenance duties and powers under these Bylaws and the Declaration, provided that the manager shall at all times remain subject to the general control of the Board."  (Section 15.1).  It is anticipated that the Non-Profit Association will contract with a sister company of LRI, Land Resource Management, Inc. ("LRM") to perform the ministerial duties of collecting duties and paying bills, all under the direction of the Board and Members.

A material decision to be made concerning the Property is whether to continue to hold it or to sell it.  Therefore, the provisions governing the sale of the Property are set forth at length.

"If the Board and/or the President of the Association determines that the value of the

-24-

Property has, or may have, increased, or that there is a present market for the Property to be sold at a profit to the Association, any officer of the Association may solicit offers for the purchase of the property from any unrelated third person or persons."  (Section 9.3(a)(i)). "[I]f Sixty Percent (60%) or more of the Voting Power elect to accept any such offer, the Association shall accept the offer so approved."  (Section 9.3(a)(i)).

"If the Board or the Association receives an unsolicited offer to purchase the Property from an unrelated third person or persons, the Board shall have the authority to examine such offer and to determine all aspects of such offer. If the acceptance of such offer would result in a profit to the Members of ten percent (10%) or more, after expenses, from the sale of the Property, the Association shall communicate the offer to the Members, with a recommendation as to the acceptance or rejection of the offer. A written vote of the Members shall be taken as described above, and, if Sixty Percent (60%) or more of the Voting Power elect to accept the offer; the Association shall accept the offer."  (Section 9.3(a)(ii)).

"If Fifty Percent (50%) or more of the Voting Power of the Members agrees that the Property should be appraised, then the Association and/or its officers may cause the property to be appraised."  (Section 9.3(b)(i)).

"If Sixty Percent (60%) or more of the Voting Power of the Members agrees that the Property should be offered for sale, and agree on an asking sales price, the Association shall list the Property with a California licensed real estate broker as described in these By-Laws. The Board shall then have the power and authority to accept an offer of purchase, from a related or unrelated third party purchaser, for an all cash sale that does not vary more than Ten Percent (10%) from the price authorized by the Members."  (Section 9.3(b)(ii)).

Upon the close of escrow from the sale of part of the Property, the Board shall cause the net proceeds to be distributed, and paid, under the same terms and conditions as a dissolution of

the Association, as provided by Section 15.8." (Section 9.3(c)(ii)).

"Upon the sale of all of the Property, and upon the distribution of all of the net proceeds from such sale to the Property Interests, equally to each such Property Interest, the Board shall cause a full accounting to be prepared and sent to each holder of the Property Interest and then shall wind up and dissolve the Association. A full accounting shall include all income, expenses, liabilities, and assets of the Association and shall clearly show all disbursements from Association funds. Upon a sale of part of the Property, the net proceeds from such sale shall be distributed in the same manner as if the entire Property had been sold." (Section 15.8).

As required by California subdivision law, LRI suggests the first budget for the Non-Profit Association which is attached to the Application filed with the CA Department of Real Estate and is approved by the DRE. Thereafter, the Board adopts the budget for the Non-Profit Association and assessments are made of the Members. (Sections 9.1(k), 12.5(a)).

**B.    CC&Rs)**

The CC&Rs were adopted "in furtherance of a plan established for the purpose of holding, for eventual resale, of the Property and the Property Interests." (Introductory provisions of CC&Rs). The following CC&R Sections are particularly relevant:

Section 1.16. "Improvement" means whatever improvements are situated on the Property at the time it becomes subject to this Declaration; neither the Declarant nor the Association are authorized or empowered to add any improvements to the Property, except as specifically set forth in this Declaration.

Section 2.1(c). No Use or Occupancy of Property. During the term of this Declaration, no Member, other than Declarant, shall be entitled to use or occupy the Property for any purpose, including, but not limited to listing or stating the address of the Property as the address of any Member for any purpose whatsoever. It is the intent of Declarant and the Association that the Property shall be purchased and held by the Association and the Members solely for the purpose of holding the Property for at least the Initial

-26-

Determination Period and then offer the Property for sale to an unrelated third party or parties. The future sale of the Property shall be as described in the By-Laws of the Association.

Section 3.1. _Purposes and Powers_.  The Association is formed to provide a mechanism to . . . assess the Members the requisite amounts to maintain the Property and pay the real estate taxes and assessments. ***The Association shall have neither power nor authority to improve the Property or to develop the Property.*** (Emphasis added).

### C.   ARTICLES OF INCORPORATION

Article 2.B of the Articles of Incorporation indicate that the "specific and primary purpose for which the corporation (Non-Profit Association) is formed is to care for, manage, maintain and sell the real property and improvements, if any, thereof." Further, Article 3 provides that "[n]o part of the net earnings of the corporation shall benefit any private member or individual [other than by acquiring, maintaining and selling the real property to be held by the members of the corporation or by a rebate of excess membership dues, fees or assessments.]" Further, the Non-Profit Association is a non-profit entity and could not distribute any profits from its operations to its members pursuant to California law.

### D.   DEVELOPER'S DISCLOSURE STATEMENT (Exhibit 4)

This document discloses that LRI is selling a certain number of acres of more or less open Real estate in equal, undivided interests.  It provides that the Property will be held for an unspecified period of time, but the Property may be sold at any time upon the approval of 60% of the Members with the proceeds being disbursed on a pro rata basis.  LRI discloses that the real estate is subject to market and other economic fluctuations, and LRI has no intention of seeking government approval for zoning or other entitlements; rather, the sole intention is to hold the Property for sale at some undetermined future date.

### E.   GRANT DEED AND IRREVOCABLE POWER OF ATTORNEY (Exhibit 5)

-27-

Each purchaser of a Real Estate Interest receives a traditional grant deed evidencing the ownership of a Real Estate Interest in the Property.  Each grant deed is recorded with the county upon close of the purchase escrow.  Each grant deed gives the Non-Profit Association an irrevocable power of attorney with regard to purchaser's Real Estate Interest.  The purpose of the irrevocable power is to allow for an orderly and timely transfer of ownership of 100% of the Real Estate Interests in a particular Property upon the vote of the super majority of members to sell.

F.      PUBLIC REPORT

California law and regulations require purchasers of a Real Estate Interest be afforded an opportunity to read the Public Report issued by the CA Department of Real Estate for the Property.  While the Public Report is provided by the DRE, it is neither a recommendation nor endorsement of the subdivision; rather, it is for information purposes only.  The Public Report is a summary of the material terms and conditions of the offer and sale of Real Estate Interests by LRI.

It contains, in a section titled "Special Notes," what would generally be considered a disclosure of "Risk Factors."  The Special Notes provide that the Property is undeveloped raw real estate and forbids LRI from making any representation that the purchase would either be an investment or that it can be used for any purpose, as follows:

"NO REPRESENTATIONS MAY BE MADE BY SUBDIVIDER OR AGENT THAT
THE PROPERTY HAS INVESTMENT MERIT, FUTURE APPRECIATION
POTENTIAL, OR MAY BE USED FOR ANY PURPOSE."

The Public Report also cautions potential buyers that the Property may be difficult to resell without proper marketing, that there may be competition with other undivided interest owners when the time to sell arrives, and that the 60% approval required to sell the real estate may be difficult to reach, as follows:

"THE PROSPECT THAT A LAND DEVELOPER AT SOME UNDETERMINED FUTURE
DATE WILL OFFER TO PURCHASE THE PARCEL IN WHICH YOU AND OTHERS OWN

-28-

UNDIVIDED INTERESTS WILL BE DETERMINED BY MANY VARIABLES OVER WHICH

YOU MAY HAVE LITTLE OR NO CONTROL; SUCH VARIABLES COULD INCLUDE

PREVAILING MARKET CONDITIONS AND DEMAND, DESIRABILITY OF THE

LOCATION OF YOUR PARCEL, AVAILABILITY AND PRICE OF COMPETING PARCELS,

ZONING AND DISTANCE TO POWER, WATER AND SEWER."

It also informs potential buyers of their legal right to rescind the offer within three calendar days

of signing the offer to purchase as provided by California law. It goes on to inform buyers that

they will become members of the Non-Profit Association upon purchase and that the Non-Profit

Association will assess each property interests based on the budget prepared by LRI and

submitted to the CA Department of Real Estate as part of LRI's seeking authorization through the

issuance of a Public report to sell the Real Estate Interests. The Public Report notes that a Real

Estate Interest is subject to CC&Rs (discussed above).

### G. Marketing Materials

Proulx admits Paragraph 63:

Upon information and belief, and thereupon it is alleged, that from and after 2008 Selling

Defendants changed their public advertising to conform to the requirements of their real

estate and subdivision licensing.

Proulx fails to deny Paragraph 64 :

However, upon information and belief, and thereupon it is alleged, that from and after 2008

Selling Defendants also maintained a parallel and guarded advertising program that was

shown only to certain trusted associates of LRI and potential purchasers of Investments.

Proulx fails to deny Paragraph 65 :

Upon information and belief, and thereupon it is also alleged, that from and after some date

in the 1990s, through the current date, Selling Defendants allowed certain salespeople and

their associations to maintain websites not utilizing the name of the Selling Defendants, but

which contained advertising material that was either or both prohibited by the California Department of Real Estate or which would constitute advertising of a security, and which were used to reach a broader audience and then funnel prospective purchasers to Selling Defendants.

Proulx fails to deny Paragraph 66 :

Upon information and belief, and thereupon it is alleged, that as late at February 29, 2009, the Selling Defendants ran radio advertisements in which Defendant Proulx stated that the public reports allow a "unique ownership investment," that investors could make great profits in LandBanking, that an investment in land can result in impressive profits for the savvy investor and that the objective of LandBanking is appreciation in value of the land, all for the purposes of monetary gain by investors.

Proulx fails to deny Paragraph 67 :

Upon information and belief, and thereupon it is alleged, that as late at February 29, 2009, the Selling Defendants ran video advertisements in which it the overriding theme is that Defendant LRI operates its LandBanking business so that purchasers of interests are investors, and that the purpose of investing in such business is to realize profit or appreciation, since "LandBanking is all about investment."

Proulx fails to deny Paragraph 69 :

Upon information and belief, and thereupon it is alleged, that in making sales, specifically including sales for LandBank III, the Selling Defendants presented that the land in Lancaster (where the Properties are located) would be a very productive "investment," because it was a developing expanding place, and that it is "it is best to buy 'now' so that it could be sold for the most profit."

## IV.   LEGAL ANALYSIS

Except as otherwise noted, this analysis will jointly discuss the application of California and federal law, since the definition of "security" under federal law served as the model for the definition in Corporations Code Section 25109, and "[a]s such, decisions interpreting the federal definition are helpful in resolving issues presented under the state law." *People v. Figueroa*, 41 Cal.3d 714, 728 fn 14 (1986).

## A.      INTRODUCTION

### 1.      The Form of the Title Document Is Not Controlling

What the purchasers of a Real Estate Interest receive is a grant deed to an undivided interest in real estate that is recorded with the local recorder.  The fact that the manner in which title passes is a grant deed in real estate is not dispositive.  The United States Supreme Court, in _S.E.C. v. C.M. Joiner Leasing Corporation_, 320 U.S. 344, 352-353 (1943), held that:

> "In applying acts of this general purpose, the courts have not been guided
> by the nature of the assets back of a particular document or offering.  The
> test rather is what character the instrument is given in commerce by the
> terms of the offer, the plan of distribution, and the economic inducements
> held out to the prospect.  In the enforcement of such an act such as this it
> is not inappropriate that promoters' offerings be judged as being what
> they were represented to be (footnotes omitted)."

_See, also, People v. Figueroa_, 41 Cal.3d 714, 733-34 (1986).

Thus, although the purchaser of a Real Estate Interest receives a recorded grant deed insured by a policy of title insurance, that fact alone does not determine whether a Real Estate Interest is a security.

### 2.      Naked Real Estate Transfer Is Not a Security

In _SEC v. C.M. Joiner Leasing Corporation_ the United States Supreme Court considered whether assignments of oil leases could constitute a security.  In that case the court found that there was a security because more was being sold than just the real estate interest.  Implicit in the sales efforts was the implication that the seller would develop the oil wells. _Id_. at 349.  If, however, the sellers had omitted the promised development of the oil leaseholds, there would have been no security, as stated by the court, as follows:

> "Undisputed facts seem to us however to establish the conclusion that
> defendants were not as a practical matter offering naked leasehold rights.

Had the offer mailed by the defendants omitted the economic inducements of the proposed and promised exploration well it would have been a quite different proposition.  Purchasers then would have been left to their own devices for realizing upon their rights.  They would have anticipated waiting an indefinite time . . . " *Id*. at 348.

What the United States Supreme Court in *SEC v. C.M. Joiner Leasing Corporation* said would be a quite different proposition is the facts of the sale of the Real Estate Interests.  LRI omits all economic inducements related to the development of the Property post-sale.  There is no promised development. Rather, unlike *SEC v. C.M. Joiner Leasing Corporation*, all that is transferred is the naked undivided interest in real estate.  No development project is contemplated or transferred.  As stated, the CC&Rs actually prohibit any development. Purchasers are literally left to their own devices for realizing upon their rights and can anticipate waiting an indefinite period of time to realize appreciation, if any. Therefore, under the analysis of *SEC v. C.M. Joiner Leasing Corporation*, without more, the Real Estate Interests are not a security.

It is that slight bit of "more" that continues the issue of whether a Real Estate Interest constitutes a security.  That slight bit of "more" is the existence of the Non-Profit Association.

This letter will demonstrate that the facts concerning the Non-Profit Association do not bring the transaction within the Securities Acts."

### 3.    Choice of Entity is Not Dispositive

"The federal securities laws apply to any investment described by the broad statutory definition of a 'security' unless an exemption applies. This suggests that the type of business association and other aspects of the investment's external form should not matter, and that the securities laws should apply whenever appropriate for the protection of investors. Indeed, the Supreme Court often has expressed this view. .... [yet] 'form' must matter. ... Courts

-32-

1    have, in fact, emphasized form over substance by holding that a general

2    partnership interest is presumptively a nonsecurity, and that corporate stock is

3    per se a security.   Form and substance in the definition of a 'security':" The

4    case of limited liability companies.   Washington and Lee Law Review , Summer

5    1994  by Ribstein, Larry E.

6    In the case of the sale of the Real Estate Interests, the identification of the

7    entity is enlarged by the fact that while what is sold is an undivided interest in real

8    estate evidenced by a grant deed, the grant deed is subject to CC&Rs which

9    subject the ownership of the Real Estate Interest to the governance of the Non-

10   Profit Association.   Any suggestion, however, that the organization of the Non-

11   Profit Association in a corporate form (with or without stock) determines the issue

12   was rejected by the United States Supreme Court in United Housing Foundation,

13   Inc. v. Forman, 421 U.S. 837, 848 (1975) (footnotes omitted), citing, Tcherepnin v

14   Knight, 389 U.S. 332 (1969) and Howey, supra, as follows:

15        "We reject at the outset any suggestion that the present transaction,

16        evidenced by the sale of shares called 'stock,' must be considered a

17        security transaction simply because the statutory definition of a security

18        includes the words 'any . . . stock.'   Rather, we adhere to the basic

19        principles that has guided all of the Court's decisions in this area: '[i]n

20        searching for the meaning and scope of the word "security" in the Acts[s],

21        form should be disregarded for substance and emphasis should be on

22        economic reality."

23

24   The United State Supreme Court in United Housing Foundation, Inc, at p. 849, went even

25   further, citing Church of the Holy Trinity v. United States, 143 U.S. 457 (1892), as follows:

26

27        "[a] thing may be within the letter of the statute and yet not within the

28        statute, because not within its spirit, nor within the intention of its

          makers."

1

2          Therefore, the organization of a Non-Profit Association as a mutual benefit corporation

3   does not make a Real Estate Interest a security.

4

5               **4.      Underlying Substance of the Real Estate Sale Governs Issue**

6          "What constitutes a security is a question of fact to be decided on a case-by-case basis."

7   *Moreland v. Department of Corporations*, 194 Cal.App.3d 506, 512, (1987) citing *People v.*

8   *Figueroa*, 41 Cal.3d 714. (1986).  In *Figueroa* the Supreme Court noted: " ... the corporate

9   securities laws do not contain an 'all-inclusive formula by which to test the facts in every case.

10  And the courts have refrained from attempting to formulate such a test .... In arriving at a

11  determination, the courts have been mindful that the general purpose of the law is to protect

12  the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment

13  schemes and the securities based thereon." *Id*. at p.736.  The substance of a transaction rather

14  than its form governs whether the transaction is deemed a security. *Moreland, supra*, 194

15  Cal.App.3d at p.512. "The term 'investment contract' has been interpreted to reach 'novel,

16  uncommon, or irregular devices, whatever they appear to be ... ' (citation omitted)" *Hocking v.*

17  *Mayless Dubois*, 885 F.2d 1449, 1455 (1989).  "It embodies a flexible rather than a static

18  principle, one that is capable of adaptation to meet the countless and variable schemes devised

19  by those who seek the use of the money of others on the promise of profits." *SEC v. Howey Co.*,

20  328 U.S. 293, 299 (1946).

21         Courts have devised several "tests" to determine whether an arrangement constitutes a

22  security.  The federal courts have devised tests under the *Howey* line of cases, which stems from

23  *S.E.C. v. Howey Co.*, *supra*, and California courts have developed the "risk capital" test, which

24  stems from *Silver Hills Country Club v. Sobieski*, 55 Cal.2d 811 (1961).  California courts

25  acknowledge that either or both of the federal "Howey test" and the California "risk capital" test

26  may be applied to determine whether an investment is a security.  *Moreland, supra*, 194

27  Cal.App.3d at pp. 561-562, and *People v. Figueroa*, 41 Cal.3d 714, 733-34. (1986).

28

            **B.      HOWEY RISK CAPITAL TEST APPLIED TO THE REAL ESTATE INTERSTS**

The "risk capital" test requires a consideration of the following factors: (1) whether funds are being raised for a business venture or enterprise; (2) whether the transaction is offered indiscriminately to the public at large; (3) whether the investors are substantially powerless to effect the success of the enterprise; and (4) whether the investors' money is substantially at risk because it is inadequately secured. *Leyva v. Superior Court*, 164 Cal.App.3d 462, 470 [210 Cal.Rptr. 545] (1985).

### 1.   Business Venture of Enterprise

Central to the risk capital test is that funds solicited be used for a business venture or enterprise. It is not enough to satisfy this prong of the risk capital test that the proceeds from the sale of some product generally contribute to the seller's business capital.  "(E)very purchaser of a product from a seller, who reinvests the proceeds of the sale in his business operations, contributes to a seller's business capital. Notwithstanding, such a contribution is an investment in the purchased product and not a contribution of risk capital to a business enterprise within the normal scope of securities regulation." *Moreland v. Department of Corporations,* 194 Cal.App.3d 506, 522, 239 Cal.Rptr. 558 (Cal.App.5.Dist., 1987).  To be considered risk capital, the money being invested must in some fashion relate to a venture in which the investors have an interest in the profits and losses. *Id*.

Although it was analyzed pursuant to the Howey test, *McCown v. Heidler*, supra. suggests the linkage that is required between the investment and the enterprise in order to be considered risk capital.  There, the purchasers of undeveloped real estate could be said to have invested risk capital because a portion of their invested funds were to be used by the developer to improve the real estate that they had purchased.  In other words, they both purchased real estate and supplied the funds for the improvements that would be necessary to return them profits on their investment.

At first blush, in the LRI sales, purchasers of Real Estate Interests are paying for nothing more than the real estate itself which they are buying from LRI.  No part of the proceeds is used to improve the Property.  No part of the proceeds is used as capital for the Non-Profit Association.  All of the capital is deposited into LRI accounts and used as general operating capital of that business which the purchaser has no part of.  It would, based upon the documents, appear that the potential return of profits to a purchaser is wholly independent of whether LRI is a successful business *or even whether LRI continues or ceases to exist*.

But, in fact, in operation, the fortunes of LRI and the Associations and Investors are those of linked lovers.

The capital that is used to conduct operations of the Non-Profit Association (i.e. pay taxes, insurance, accounting, etc.) is not part of any initial purchase of the real estate interest.  Rather, the Non-Profit Association creates a budget and assesses members for their pro rata share of expenses.  Those dues are collected by LRI or its sister entity LRM and a portion of those dues then are paid back to such entities as a management fee.  Should the property ever be sold, LRI would receive a commission.  Additionally, even though the initial CC&Rs forbid development, Mr. Proulx suggested and had the CC&Rs of LandBank III ("LBIII") amended to allow seeking final map approval (while 99.99 % is done, the remaining issue has dragged on for years).  Mr. Proulx has suggested that the majority of other landbanks also seek final map status, which would of course require them to pay his companies additional fees.  Therefore, the "enterprise" would satisfy the following analysis/test.

In order to satisfy the risk capital test, an investor must formulate a reasonable understanding that a valuable benefit of some kind over and above the initial value will accrue to the offeree as a result of the operation of the enterprise.  There is no doubt that the offeree (LRI) of the Real Estate Interest hopes for a valuable benefit to continue to accrue over and above the initial value that it supplied, this hope/expectation comes "as a result of the operation of the enterprise" [i.e. the Non-Profit Association].  Finally, a LandBank owner expectation of a profit, comes not just solely from the intrinsic appreciation of the real estate itself from factors outside

the control of the client, but from the managerial efforts of Darren Proulx, LRI and LRM, all of which have a vested financial interest in the ongoing enterprise.

Proulx failed to deny paragraph 72:

> Upon information and belief, and thereupon it is alleged, that at the time of the sale, the Selling Defendants, and, thereafter, the Defendant Proulx,  consistently assured potential purchasers of the Investment that he would manage the property so that they would not have to worry about its management or management decisions.

Proulx failed to deny paragraph 75:

> An ongoing business enterprise exists.  The capital that is used to conduct operations of the Association (i.e. pay taxes, insurance, accounting, etc.) is not part of any initial purchase of the Investments..  Rather, each of the Associations creates a budget and assesses members for their pro rata share of expenses.  An individual Investor is powerless by himself or herself to affect the amount of dues that are imposed.

Proulx failed to deny paragraph 82:

> For a majority of the period of time, under the bylaws and CC&Rs, LRI also had the legal authority to make any and all decisions even  after the final close of escrow on the Investments due to the fact that at the time of purchase by the Majority Plaintiffs, LRI had the right to control the board and named Proulx as the President of each Association until 2009.  Proulx was not voted in as President at the Investor meetings held in 2009 and 2010, but Proulx still effectively chose who would run for the boards, and, by controlling the majority of the votes through proxies, effectively solely determined who would be on the boards and in which offices.

## 2.  Membership in the Non-profit association is a California Security By Definition.

Section 25019 of the Corporate Securities Laws includes in its definition of "security" any "membership in an incorporated or unincorporated Association."  That definition is extremely

broad and would seem to include membership in any association, whether a church, the Boy Scouts, a home owners association, or as is our case, an association of owners of individual interests.

### 3.   Offering to the Public at Large

The sale of Real Estate Interests have been offered to thousands of people and sold to at least 1,400. Proulx admits Paragraph 14, which states:

> Upon information and belief, and thereupon it is alleged, that as of the time of fling, LRI  has sold to more than 1,400 individual Investors holding approximately 2,000 Investment interests in approximately 17 projects.

### 4.   Power of Investors

The individual investors each hold no power in practice.

Proulx fails to deny in Paragraph 38:

> Historically, all of the Associations have retained LRI to manage the Properties and Associations, such as the collection of dues, the payment of property taxes and the planning of the annual meetings; however, the are theoretically free to engage any entity to perform such functions or to perform them "in house," but in practice, Defendant Proulx so controls the voting that there  has not been a change away from his companies as managers.

Proulx fails to deny in Paragraph 42:

> However, in practice Defendant Proulx has acquired at least one Investment in each Property and until the shareholders meeting held in 2009, had been the sole president of each Association and controlled the Directors of each Association.

Proulx failed to deny paragraph 75:

> An ongoing business enterprise exists.  The capital that is used to conduct operations of the Association (i.e. pay taxes, insurance, accounting, etc.) is not part of any initial purchase of the Investments..  Rather, each of the Associations creates a budget and assesses members for their pro rata share of expenses.  An individual Investor is powerless by himself or herself to affect the amount of dues that are imposed.

Proulx fails to deny in Paragraph 82:

> For a majority of the period of time, under the bylaws and CC&Rs, LRI also had the
> legal authority to make any and all decisions even after the final close of escrow
> on the Investments due to the fact that at the time of purchase by the Majority
> Plaintiffs, LRI had the right to control the board and named Proulx as the President
> of each Association until 2009.  Proulx was not voted in as President at the
> Investor meetings held in 2009 and 2010, but Proulx still effectively chose who
> would run for the boards, and, by controlling the majority of the votes through
> proxies, effectively solely determined who would be on the boards and in which
> offices.

## 5.    Adequacy of Security

It is generally said that securities are marked by a general intangible interest in the
general assets of the venture or enterprise.   Once again, the situation on the face of the
documents would appear almost exactly the opposite in the case of a Real Estate Interest.  That
is because In the case of a Real Estate Interest, the purchaser of each Real Estate Interest
receives a recorded grant deed in real estate guaranteed by a policy of title insurance. LRI could
go bankrupt or otherwise cease to exist or the Non-Profit Association could be dissolved, but the
purchasers would still have their recorded Real Estate Interests.  The ownership of a Real Estate
Interest by the purchaser is not directly affected by the success or failure of LRI or of the Non-
Profit Association

However, in practice, the value of adequacy of each security is only a portion of its true
value if all the securities (i.e., the entire parcel) is sold at one time.   That may be true of all
securities, i.e., the takeover value of an entire company is often greater than the aggregate value
of the individual securities.  However, in this case, there appears to be almost no market for the
Real Estate Interests.

## C.    HOWEY FACTORS

The test defined in <u>SEC v. Howey Co.</u>, *supra*, 328 U.S. at p. 301 is "whether the scheme
involves an investment of money in a common enterprise with profits to come solely from the

-39-

1   efforts of others". The term "common enterprise" is defined as "one in which the fortunes of the

2   investor are interwoven with and dependent upon the efforts and success of those seeking the

3   investment or of third parties". *SEC v. Glenn W. Turner Ent. Inc.*(9th Cir. 1973) 474 F.2d 476, 482

4   and fn.7; *Moreland, supra,*194 Cal.App.3d at p. 562. The *Glenn W. Turner* court interpreted the

5   phrase "solely from the efforts of others": " ... in light of the remedial nature of the legislation,

6   the statutory policy of affording broad protection to the public, and the Supreme Court's

7   admonitions that the definition of securities should be a flexible one, the word "solely" should

8   not be read as a strict or literal limitation on the definition of an investment contract, but rather

9   must be construed realistically, so as to include within the definition those schemes which

10  involve in substance, if not form, securities." *Id.* The fact that investors must exert some effort to

11  achieve a return does not preclude finding an investment contract; the test is "whether the

12  efforts made by other than the investor are the undeniably significant ones, those essential

13  managerial efforts which affect the failure or success of the enterprise. *Id.* Under *Howey*, there

14  are three factors to be considered, as follows:

### 1.   Investment of Money

16  Inasmuch as the purchasers of Real Estate Interests from LRI do not intend to use or

17  consume the real estate [and are, in fact, precluded from doing so], it is presumed that the

18  purchase of a Real Estate Interest is for investment purposes.  This is true even though, pursuant

19  to the Public Report issued by the CA Department of Real Estate, LRI cannot refer to "investment

20  merit" or the potential for "profit" or "appreciation" to prospective purchasers.

### 2.   Common Enterprise

### (i)   Commonality Generally

23  There is little question as to whether a common enterprise exists in this case.  To

24  determine if a common enterprise exists, courts have looked for either "horizontal commonality"

25  (an enterprise common to a group of investors) or "vertical commonality" (an enterprise

26  common to an investor and the seller or promoter).  *S.E.C. v. R.G. Reynolds Enterprises, Inc.,* 952

27  F.2d 1125, 1134 (9th Cir. 1991).  Federal courts have defined horizontal commonality as the

28  situation where each individual investor's fortune is tied to the fortunes of the other investors by

the pooling of assets, often combined with the pro-rata distribution of profits.  *Reynolds*, 952

F.2d at 1134.  Vertical commonality occurs where "the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." _S.E.C. v. Unique Financial Concepts, Inc.,_ 196 F.3d 1195, 1199 (11th Cir. 1999).

(ii)    <strong>Vertical Commonality Exists</strong>

In the LRI offering, there is vertical commonality.  While LRI sells 100% of the Real Estate Interests it creates in the Property, it has been discussed at length Mr. Proulx has an ongoing interest in the continuation of the Associations, and the members of the Associations have an ongoing perceived need for Mr. Proulx.  Hence a common enterprise exists vertically. [Provide more description]

For example, Mr. Proulx fails to deny Pargraph 29:

> Originally LRC and then LRI both sold the Investments to the Investors, and then, after the close of escrow for each Property, also managed the respective corporation created by LRI to manage each respective Property and the Investors who hold Investments in such Property (such corporations shall be referred to as an "Association," or jointly as "Associations").

(iii)    <strong>Horizontal Commonality Exists</strong>

Voting interests in the Non-Profit Association creates some kind of community of interest among the Non-Profit Association members, especially because that is how all decisions affecting the jointly owned parcel are made.  Title to the Real Estate Interest purchased from LRI by a purchaser is effectively pooled among investors for at least two reasons, even though title to the Real Estate Interest remains with the individual purchaser and it is freely transferable by the purchaser at almost any time.  First, if property taxes are not paid, even if this is not likely, the ownership interest of a member who has fully paid his dues can still be lost.  Secondly, in order to receive anywhere near the full value of the investment, the member must sell at a time that all members are selling.  Finally, even if an individual member does not want to sell, he must sell if 60% of the other interests are voted to be sold.  Hence horizontal commonality exists.

Mr. Proulx fails to deny Paragraph 21:

> Further,  which it then offers for sale (the "Real Estate Sale") to third party individuals and entities ("Potential Investors").  Selling Defendants represent that

-41-

1      by purchasing an Investment, individuals are able to participate in LandBanking a

2      much larger piece of real estate than they might otherwise be able to afford based

3      solely upon their individual buying power.

4  Mr. Proulx admits Paragraph 36:

5      Each Association provides an organizational structure for the Investor to sell the

6      entire Property (i.e. sixty percent of the Investors may elect to sell the entire

7      Property) rather than just their individual Investment.

8  Mr. Proulx fails to deny Paragraph 47:

9      Each purchaser of a Interest receives a traditional grant deed evidencing the

10      ownership of a Investment in a Property.  Each grant deed is recorded with the

11      county upon close of the purchase escrow.  Each grant deed gives the Association

12      an irrevocable power of attorney with regard to purchaser's Investment.  The

13      purpose of the irrevocable power is to allow for an orderly and timely transfer of

14      ownership of 100% of the Investments in a particular Property upon the vote of

15      the super majority of members to sell.

16  Mr. Proulx fails to deny Paragraph 88:

17      Additionally, the Associations creates a pro rata sharing of expenses to maintain

18      the entire respective Property.  The Association also creates a pro-rata sharing of

19      profits or proceeds, when the central purpose of the Investment is made: the

20      ultimate disposition of the entire Property. This disposition can occur only if the

21      Investors holding 60% of the Investments in a Property choose to sell an entire

22      Property.

23  Mr. Proulx admits Paragraph 97:

24      Plaintiff Coppola was hired as an employee on or about November 27, 2008 by

25      Defendant LRI to act as in-house general counsel, and with the expectation that

26      Plaintiff would also act as general counsel for approximately 17 associations

27      ("Associations") formed by Defendant LRI to manage the Interests sold to

28      investors.  [Emphasis added.]

        3.    Profits from the Efforts of Others

1                    (i)       **Managerial Efforts of Third Parties Generally Considered**

2        This prong of the *Howey* test is clearly present.  Mr. Proulx has failed to deny that he

3 manages and controls the Associations.

4        The individual investors each hold no power in practice.

5        Mr. Proulx fails to deny Paragaph 37.

6              The Association for each Property is theoretically independent of the Associations

7              for each other Property, but in practice they have been jointly managed by the

8              Managing Defendants, with the exception of a Property known as Land Bank III,

9              which has required and received additional separate management.

10        Proulx fails to deny in Paragraph 38:

11              Historically, all of the Associations have retained LRI to manage the Properties and

12              Associations, such as the collection of dues, the payment of property taxes and

13              the planning of the annual meetings; however, the are theoretically free to

14              engage any entity to perform such functions or to perform them "in house," but in

15              practice, Defendant Proulx so controls the voting that there  has not been a

16              change away from his companies as managers.

17        Proulx fails to deny in Paragraph 42:

18              However, in practice Defendant Proulx has acquired at least one Investment in

19              each Property and until the shareholders meeting held in 2009, had been the sole

20              president of each Association and controlled the Directors of each Association.

21        Proulx fails to deny Paragraphy 72:

22              Upon information and belief, and thereupon it is alleged, that at the time of the

23              sale, the Selling Defendants, and, thereafter, the Defendant Proulx,  consistently

24              assured potential purchasers of the Investment that he would manage the

25              property so that they would not have to worry about its management or

26              management decisions.

27        Proulx failed to deny paragraph 75:

28              An ongoing business enterprise exists.  The capital that is used to conduct

             operations of the Association (i.e. pay taxes, insurance, accounting, etc.) is not

1   part of any initial purchase of the Investments.. Rather, each of the Associations

2   creates a budget and assesses members for their pro rata share of expenses.  An

3   individual Investor is powerless by himself or herself to affect the amount of dues

4   that are imposed.

5   Proulx fails to deny in Paragraph 82:

6       For a majority of the period of time, under the bylaws and CC&Rs, LRI also had the

7       legal authority to make any and all decisions even  after the final close of escrow

8       on the Investments due to the fact that at the time of purchase by the Majority

9       Plaintiffs, LRI had the right to control the board and named Proulx as the President

10      of each Association until 2009.  Proulx was not voted in as President at the

11      Investor meetings held in 2009 and 2010, but Proulx still effectively chose who

12      would run for the boards, and, by controlling the majority of the votes through

13      proxies, effectively solely determined who would be on the boards and in which

14      offices.

15  Also many of the cases have looked at whether the "manager" made representations that he had

16  conducted special due diligence:

17      Proulx fails to deny Paragraph 69:

18          Upon information and belief, and thereupon it is alleged, that in making sales,

19          specifically including sales for LandBank III, the Selling Defendants presented that

20          the land in Lancaster (where the Properties are located) would be a very

21          productive "investment,"  because it was a developing expanding place, and that it

22          is "it is best to buy 'now' so that it could be sold for the most profit."

23  In order to satisfy the third prong of the Howey test, courts have consistently emphasized

24  that the efforts put forth by the promoter, seller or other third parties must be more than mere

25  "ministerial" functions. The Ninth Circuit has given a realistic interpretation: "whether the

26  efforts made by those other than the investor are the undeniably significant ones, those essential

27  managerial efforts which affect the failure or success of the enterprise." *S.E.C. v. Glenn W.*

28  *Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38

    L.Ed.2d 53 (1973).  "The obligation to perform minimal managerial functions or to provide basic

1  improvements does not transform a real estate sale into a securities transaction." *Aldrich v.*

2  *McCulloch Properties, Inc.*, 627 F.2d 1036, 1040 (10th Cir. 1980).  The real burden of

3  management **and development**, even by the most liberal tests, must rest on the developers. See

4  *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946); *Woodward*

5  *v. Terracor*, 574 F.2d at 1026; *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th

6  Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *Timmreck v. Munn*, 433

7  F.Supp. 396, 403 n. 4 (N.D.Ill. 1977).

8          In *S.E.C. v. Life Partners, Inc.*,  87 F.3d 536 (D.C. Cir. 1996), individuals were offered

9  fractional interests in insurance policies by Life Partners, Inc. ("Life Partners").  Purchasers

10  investing in the policy of an insured that dies quickly would make more money on their

11  investment, whereas purchasers investing in someone who lived longer would make less.  After

12  the sale of an interest, Life Partners would perform certain ministerial functions, such as paying

13  fees and having the ability to change the designated beneficiary.  These duties were described as

14  "clerical and routine."

15          The court held that the interests were not securities.  The court pointed out that

16  performing these ministerial functions did not add value to the investment.   There must be an

17  "association between the profits of the investors and the 'efforts' of the promoter." *Id*. at 545.

18  Ministerial functions, the court noted, "should receive a good deal less weight than

19  entrepreneurial activities."  *Id*. at 548.  Since none of the ministerial functions had "a material

20  impact upon the profits of the investors," the investments were not securities. *Id*. at 548.

21          In the LRI offering, the Non-Profit Association provides complete management and

22  control of the investment, including seeking potential buyers, providing information on the

23  investment at annual meetings, ensuring legal compliance, and suggesting that certain landbanks

24  be seek map status, all as either admitted, or failed to deny by Proulx in the initial paragraphs of

25  this section, above.

26          **Managerial Efforts, Creates Profit Potential**

27                  **a.        Proulx Provides the Essential Managerial Effort**

28

1 | In determining whether a transaction such as that involved here constitutes a security, of the
2 | many factors considered, the courts have focused primarily upon one factor: do persons other
3 | than the investors provide the essential managerial efforts from which the investors expect
4 | profits? *D. K. Properties, Inc. v. Osborne*, 143 Ga.App. 832, 240 S.E.2d 293, Ga.App. 1977. In *S. E.*
5 | *C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 477 (fn. 7) (1974), the Fifth Circuit Court of Appeals
6 | ascribed the over-lap between the Howey test and the Risk Capital test "to the fact that the
7 | element of managerial control is implicit in the risk capital test . . . "

**b.      Control is Held by the Purchasers**

9 |      It is often repeated that the proper focus must be the agreement between the parties
10 | and not how in fact the entity function in carrying out its business affairs. *Reeves v. Teuscher*,
11 | 881 F.2d 1495, 1500 (9th Cir. 1989) (discussing whether a general partnership could be
12 | considered a security). The "court is 'limited to assessing the expectations of control at the
13 | inception of the investment' but post-investment actions may indicate what those expectations
14 | were." *S.E.C. v Merch. Capital, LLC,* 483 F.3d 747, 760 (11th Cir. 2007), *citing Williamson*
15 | *v.Ttucker*, 645 F.2d 404, 424 n. 14 (5th Cir 1981). "As courts have held, 'the mere choice . . . to
16 | remain passive is not sufficient to create a security interest.'" *Endico v. Fonte*, 485 F. Supp. 2d
17 | 411, 415 n 16 (S.D.N.Y. 2007), citing *Rivanna Trawlers Unlimited v. Thompson Trawlers*, 840 F.2d
18 | 236, 240-41 (4th Cir. 1988). In this case, each individual investor does not have a choice, because
19 | even if the individual investor were to be extremely active, as is the case of the 13 potential
20 | defendants, Proulx has so controlled the Associations  (especially because of the lack of
21 | sophistication of the majority, many of whom do not speak English) that the individual has no
22 | control.

23
24
25
26
27
28

1

2

## V.   **Conclusion.**

3

4  Wherefore, for the reasons stated in this Brief, Plaintiff Coppola respectfully hereby moves for

5  summary judgment, pursuant to Fed.R.Civ.P. 56, on all the first and second Counts filed against

6  the Selling Defendants.

7  Dated:                                                Friday, June 24, 2011

8

9

10                                                       Ralph Stephen Coppola
                                                         Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF MAILING**

I hereby certify that on this 24th day of June, 2011, I depoisted the foregoing Motion for Partial Summary Judgement into the US Mail, Postage prepaid, addressed to:

Robert A. Koenig

Ryan Kerbow

Alessi & Koenig, LLC

9500 W. Flamigo, Suite 205

Las Vegas, NV 89147

Ralph Stephen Coppola