

_____ FILED          _____ RECEIVED
_____ ENTERED        _____ SERVED ON
            COUNSEL/PARTIES OF RECORD

JUL 1 4 2011

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

1  Ralph Stephen Coppola
   4785 Rio Pinar Drive
2  Reno, NV 89509
   Pro Se
3  775 827 2344

4                    UNITED STATES DISTRICT COURT
5                    DISTRICT OF NEVADA - RENO

6  RALPH STEPHEN COPPOLA,        )    CASE NO.:    3:2011cv00074
            and                  )    DEPT. NO.:
7  DOES I to XX,                 )
         Plaintiffs              )    AFFIDAVIT IN SUPPORT OF
8                                )    MOTION FOR PARTIAL
         vs.                     )    SUMMARY JUDGEMENT
9                                )
   DARREN K. PROULX, LAND        )
10 RESOURCE INVESTMENTS,         )
   INC., LAND RESOURCE           )
   MANAGEMENT, INC., and         )
11 MARINA COMMERCIAL OFFICES, LLC)
            and                  )
12 DOES I to XX,                 )
         Defendants              )
13 -------------------------------------

14

15     1.  COMES NOW, Ralph Stephen Coppola, the named Plaintiff, herein, (hereinafter
16         "Coppola") who being duly sworn, depose and say;
17
18     2.  Plaintiff, Ralph Stephen Coppola, does make the following affirmation under penalty
19         of perjury;
20     3.  Plaintiff Ralph Stephen Coppola  ("Coppola") was the Nevada State Bar licensed "in-
21         house" counsel to defendants.
22     4.  As counsel for defendants Plaintiff came into confidential information that supports
23         the allegations of this case.
24     5.  Plaintiff, however, was hoping that defendants would file a responsive pleading to
25         Plaintiff's Motion for Partial Summary Judgment which would obviate the need for an
26         Affidavit disclosing confidential information.
27     6.  Defendants, however, appear to have failed to file a responsive brief, which
28         responsive brief appears to have been due some three days ago, on Monday, July 11,
           2011.

                                    -1-

7. The Nevada Rules of Professional Responsibility 1.6(b) and 1.9(c) allow the permissive disclosure of confidential information in limited circumstances.

8. Those permissive disclosures allow the using of information relating among other times (a) to the representation of a formerly represented client except as the rules would permit, such as in the instant matter where my services were used to commit a fraudulent and (b) to establish a claim in a controversy between the lawyer and the client.

9. Plaintiff was hoping to not have to rely on the permissive disclosure provisions of Nevada Rules of Professional Responsibility 1.6(b) and 1.9(c), but the apparant failure of defendants to answer requires such action.

10. Plaintiff Ralph Stephen Coppola is a resident of Nevada, residing in Reno, Washoe County, Nevada.

11. Defendant Proulx is a resident of Nevada, residing in Sparks, Washoe County, Nevada.

12. Defendant LRI is a California Corporation.

13. Defendant LRI's primary office is located in Sparks, Washoe County, Nevada.

14. Defendant Land Resource Management, Inc. ("LRM") is a Nevada Corporation.

15. Selling Defendants were (and may still be) in the business of selling to investors "LandBank" interests consisting of undivided Investments ("Investments or an "Investment, as the context requires).

16. Selling Defendants describe LandBanking generally as "the process of buying and then holding real estate located in the path of urban growth for future sale."

17. LRI is engaged in a business that it characterizes as "making LandBanking available to the average person."

18. LRI purchases or options real estate.

19. The real estate that LRI purchases or options is typically used for farming.

20. All subject real estate properties have been located in Lancaster, California.

21. Lancaster California is located approximately sixty miles from downtown Los Angeles, California.

22. Such real estate is then either further subdivided into sellable parcels or marketed by itself.  The marketed real estate shall be referred to as a "Property."

23. Defendant Proulx at all times relevant was either or both the President or CEO of LRI.

24. Defendant Proulx at all times relevant was either or both the President or CEO of LRM.

25. Defendant Proulx at all times relevant was, without regard to community property law, the sole shareholder of LRI.

26. Defendant Proulx at all times relevant was, without regard to community property law, the sole shareholder of LRM.

27. Defendant Proulx did work on occasion for Richard "Dick" Ramsey ("Ramsey").

28. At some time during or before 1999, Ramsey incorporated a company named either Land Resource Concepts, Inc.  ("LRC") or an almost exactly the same name.

29. In or about 1999, the California Department of Real Estate ["DRE"] issued a Public Report to LRC allowing LRC to subdivide property located in California into a subdivision consisting of equal undivided interests (each such undivided interest is an "Investment").

30.  Shortly thereafter, Ramsey sold LRC to Proulx.

31. Thereafter LRC was renamed LRI.

32. As of the time of fling the instant action, LRI has sold undivided real estate interests to more than 1,400 individual Investors (the "Real Estate Sale").

33.  As of the time of fling the instant action, LRI has sold to more than approximately 2,000 real estate interests.

34. As of the time of fling the instant action, LRI has sold undivided real estate interests in approximately 17 projects.

35. LRI offers for sale to third party individuals and entities ("Potential Investors") the undivided real estate interests.

36. LRI represented that by purchasing an undivided real estate interest, individuals are able to participate in LandBanking a much larger piece of real estate than they might otherwise be able to afford based solely upon their individual buying power.

-3-

37. Proulx represented that by purchasing an undivided real estate interest, individuals are able to participate in LandBanking a much larger piece of real estate than they might otherwise be able to afford based solely upon their individual buying power.

38. The undivided real estate interests are sold pursuant to public reports issued by the California Department of Real Estate.

39. The undivided real estate interests were not registered with the State of Nevada under an exemption from registration under Nevada Law.

40. Prior to late 2009, the sale of such real estate interests in Nevada was without compliance with Nevada's subdivision laws.

41. Originally LRC, and thereafter LRI, both sold the Investments to the Investors, and then, after the close of escrow for each project, also managed the respective mutual benefit corporation created by LRC or LRI to manage each respective Property and the Investors who hold Investments in such Property (such corporations shall be referred to as an "Association," or jointly as "Associations").

42. The associations include the following (with date of approximate incorporation in California set forth in parenthesis): Cal Land Resources I Association, Inc. (03/02/1999), California Land Resources II Association, Inc. (03/02/1999), Cal Land Resources III Association, Inc. (03/02/1999), Cal Land Resources IV Association, Inc. (03/22/2001), Cal Land Resources V Association, Inc. (03/22/2001), Cal Land Resources VI Association, Inc. (03/22/2001), Cal Land Resources VII Association, Inc. (03/22/2001), Cal Land Resources VIII Association, Inc. (01/12/2004), Cal Land Resources IX Association, Inc. (01/12/2004), Cal Land Resources X Association, Inc. (01/12/2004), Cal Land Resources XI Association, Inc. (01/12/2004), Cal Land Resources 033 Association, Inc. (09/28/2005), Cal Land Resources 034 Association, Inc. (09/28/2005), Cal Land Resources 008 Association, Inc. (12/08/2005), Cal Land Resources 1011 Association, Inc. (12/08/2005), Cal Land Resources 027 Association, Inc. (01/25/2006), Cal Land Resources 073 Association, Inc. (04/04/2007), Cal Land Resources 1718 Association, Inc. (10/10/2007 ~ Dissolved), Cal Land Resources 1920

Association, Inc. (10/10/2007 ~ Dissolved), Cal Land Resources 009 Association, Inc. (04/04/2008).

43. In approximately 2010, LRM took over management of the Associations, from LRI.

44. LRI adopts and records certain Covenants, Conditions and Restrictions ("CC&Rs") that are appurtenant to a Property.

45. LRI then applies to the California Department of Real Estate ("DRE") for permission to subdivide a Property into an undivided interest real estate subdivision consisting of all the Investments which constitute a Property.

46. LRI files appropriate application documentation with the DRE seeking authority from the DRE to sell the Investments.

47. When the application is approved, the DRE issues a Public Report authorizing the sale of the Investments.

48. LRI acts as an incorporator and files Articles of Incorporation for a California Non-Profit Mutual Benefit Corporation (an Association").

49. The purpose for each Association is to allow the purchasers of the Investments a mechanism for them to coordinate the management of all Investments which constitute each Property.

50. As the incorporator of each Association, LRI adopts bylaws for such Association.

51. On behalf of LRI, California licensed real estate brokers sell the Investments to third parties.

52. The proceeds from such sales of the Investments are deposited into a licensed escrow.

53.  Upon a close of escrow, each purchaser of an Investment ("Investor") in that escrow receives a separate grant deed to such Investor's Investment.

54. Title to the Investment is guaranteed by a standard CLTA policy of title insurance.

55. Historically, the average price to purchase an Investment has been in the $5,000 to $20,000 range, although the Investments for the initial Properties sold for less.

56. The gross initial Investment from the Investors and gross proceeds to the Selling Defendants have been in the range of approximately $14,000,000.00 to $20,000,000.00.

57. By virtue of the CC&Rs, each Investment includes one membership interest in the respective Association.

58. The Investors use the respective Association to provide and coordinate certain services such as paying property taxes, buying insurance, paying for accounting and tax services, keeping a Property free of weeds (as necessary), leasing the Property (if appropriate) and determining if and when to sell a Property.

59. The owners of each Investment are responsible to pay a pro-rata share of the dues of the Association.

60. The CC&Rs specifically preclude the Investors, respective Association, or any other party from developing or improving a Property in any way, or from otherwise enhancing a Property's value.

61. The Property is to be strictly held in the same condition that existed as at the time of acquisition from LRI.

62. However, in the case of one LandBank, LandBank III, after holding the parcel for a few years, the Investors voted to allow to seek final map status.

63. Each Association provides an organizational structure for the Investor to sell the entire Property (i.e. sixty percent of the Investors may elect to sell the entire Property) rather than just their individual Investment.

64. The Association for each Property is theoretically independent of the Associations for each other Property.

65. In practice the Associations have been jointly managed by LRI and the LRM (the "Managing Defendants"), with the exception of a Property known as Land Bank III, which has required and received additional separate management.

66. Historically, all of the Associations have retained LRI to manage the Properties and Associations, such as the collection of dues, the payment of property taxes and the planning of the annual meetings.

-6-

67. Each Association is theoretically free to engage any entity to perform such management functions or to perform them "in house."

68. In practice, Defendant Proulx so controls the voting of each Association through proxies that there has not been a change away from his companies as managers.

69. LRI, as incorporator of each Association, adopts the original Bylaws for each Association.

70. In practice until the shareholders meeting held in 2009, Defendant Proulx had been the sole president of each Association.

71. In practice Defendant Proulx as has controlled the Directors of each Association.

72. Each purchaser of a Interest receives a traditional grant deed evidencing the ownership of a Investment in a Property.

73. Each grant deed is recorded with the county upon close of the purchase escrow.

74. Each grant deed gives the Association an irrevocable power of attorney with regard to purchaser's Investment.

75. The purpose of the irrevocable power is to allow for an orderly and timely transfer of ownership of 100% of the Investments in a particular Property upon the vote of the super majority of members to sell.

76. Some Properties were leased as farm real estate after LRI's purchase.

77. The initial lease terms were generally for five years at ONE DOLLAR ($1.00) per year with options to extend on a yearly basis thereafter.

78. After the fifth year, the lease may be terminated if a Property is sold by an Association, but the tenant has certain rights to complete its operations for a given year.

79. The Public Report for each Property contains, in a section entitled "Special Notes."

80. The Special Notes disclose that no representations may be made by subdivider or agent that a Property has investment merit, future appreciation potential or may be used for any purchase.

81. The Special Notes caution potential buyers that a Property may be difficult to resell without proper marketing, that there may be competition with other undivided

interest owners when the time to sell arrives, and that the 60% approval required to sell the real estate may be difficult to reach.

82. The Public Report, however, does not contain most of the disclosures that would be required of a security offering to the general public under federal law.

83. The Selling Defendants utilized newspaper ads, radio ads and other forms of advertising.

84. The great majority of sales occurred through word of mouth advertising.

85. LRI estimated that approximately 80% of sales came through referrals from existing customers.

86. Referrals were generally used to funnel potential Investors to dinner seminars at which the Investments were pitched.

87. A number of these seminars were given in languages other than English in California.

88. All contracts for the sale of Investments were in English.

89. Until at least approximately 2008 representations made to potential Investors explicitly included such representations as that the projects were a "proven plan of real estate investment."

90. Until at least approximately 2008 representations made to potential Investors explicitly included such representations as that the projects had a "high future profit potential."

91. On or about April 29, 2008, The Department of Real Estate filed a complaint (the "Complaint") against LRI and its former attorney, now deceased, George R. Kucera.

92. The Complaint accused LRI of advertising "between April 11, 2006 and on or about August 31, 2007," that included representations of the Subdivision being a "proven plan of real estate investment" and having a "high future profit potential," which advertising was "false and misleading," and constituted the substantial misrepresentation of material fact."

93. During such time period the real property commonly known as LandBank 008 was for sale by LRI.

94. LRI was also accused of causing "to be published advertisements which included statements or representations that the [California Department of Real Estate] gave approval to [LRI] to sell said Subdivision [LandBank 008 - Avenue "I" and 65th Street East]."

95. On or about July 17, 2008, the California Department of Real Estate filed against LRI an Order to Desist and Refrain from "causing to be published advertisements which include statements or representations which are false, misleading or deceptive in violation of Section 11022 of the Code."

96. Effective on or about March 24, 2009, the matter was resolved by a Stipulation and Agreement which contained an Order of the Real Estate Commissioner whereby all "licenses and licensing rights of Respondent [LRI ...] are suspended for a period of sixty (60) days" . . . but allowing for a buyout of the suspension and imposing a two year probation.

97. From and after 2008 Selling Defendants changed their advertising that was viewable by the general public to generally conform to the requirements of their real estate and subdivision licensing.

98. However from and after 2008 Selling Defendants also maintained a parallel and secret advertising program that was shown only to certain trusted associates of LRI and potential purchasers of Investments.

99. Defendant Proulx attempted to have special Google searches arranged so that only certain individuals could find such parallel websites through certain search strings.

100.   From and after some date in the 1990s, Selling Defendants allowed certain salespeople and their associations to maintain websites not utilizing the name of the Selling Defendants, but which contained advertising material that was prohibited by the California Department of Real Estate.

101.   From and after some date in the 1990s, Selling Defendants allowed certain salespeople and their associations to maintain websites not utilizing the name of the Selling Defendants, but which contained advertising material that would constitute advertising of a security.

102.   From and after some date in the 1990s, Selling Defendants allowed certain
salespeople and their associations to maintain such websites not utilizing the name
of the Selling Defendants so as to reach a broader prospective customer audience
which was then funneled to Selling Defendants.

103.   As late at February 29, 2009, the Selling Defendants ran radio advertisements in
which Defendant Proulx stated that the public reports allow a "unique ownership
investment."

104.   As late at February 29, 2009, the Selling Defendants ran radio advertisements in
which Defendant Proulx stated that investors could make great profits in
LandBanking.

105.   As late at February 29, 2009, the Selling Defendants ran radio advertisements in
which Defendant Proulx stated that 'an investment in land can result in impressive
profits for the savvy investor.'

106.   As late at February 29, 2009, the Selling Defendants ran radio advertisements in
which Defendant Proulx stated and that 'the objective of LandBanking is appreciation
in value of the land, all for the purposes of monetary gain by investors.'

107.   As late at February 29, 2009, the Selling Defendants ran video advertisements in
which it the overriding theme is that the purpose of investing in an undivided real
estate interest is to realize profit or appreciation, since "LandBanking is all about
investment."

108.   As late as the spring of 2010, the Selling Defendants promised a potential return
of some 357%.

109.   In making many of the sales of the undivided real estate interests the Selling
Defendants presented that they had done the due diligence in the selection of the
Properties.

110.   This was often done through elaborate visual-aided seminars that showed the
desirability of investment in real estate in the Lancaster area.

111.   These seminars were sometimes presented in part by professional spokespeople.

112.   In making many of the sales of the undivided real estate interests the Selling Defendants presented that the land in Lancaster (where the Properties are located) would be a very productive "investment," because it was a developing expanding place.

113.   In making many of the sales of the undivided real estate interests the Selling Defendants presented that it is "it is best to buy 'now' so that it could be sold for the most profit."

114.   In making many of the sales of the undivided real estate interests the Selling Defendants consistently assured potential purchasers of the Investment that he would manage the property so that they would not have to worry about its management or management decisions.

115.   The capital that is used to conduct operations of the Associations (i.e. pay taxes, insurance, accounting, etc.) is not part of any initial purchase of the Investments.

116.   Each of the Associations is supposed to create its own budget.

117.   Each of the Associations assesses members for their pro rata share of expenses.

118.   Because Darren Proulx has historically controlled the majority of the votes of the Associations through proxies, Darren Proulx has controlled the amount of dues that are imposed.

119.   An individual Investor is powerless by himself or herself to affect the amount of dues that are imposed by an Association.

120.   Some of the Properties historically derived yearly lease income from a lease with a "farmer," which in fact is a major national carrot producer.

121.   Such "farmer" sold the land to the Selling Defendants in the first place.

122.   Selling Defendants failed to disclose that by pre-leasing some of the real estate to the farmer for only one dollar per year, that Selling Defendants were able to purchase the properties for less, while depriving the Associations of what otherwise would have been larger lease payments.

123.   For a majority of the period of time, under the governing documents of the Associations, LRI also had the legal authority to make any and all decisions for the

-11-

Associations, even after the final close of escrow due to the fact that until approximately 2008, LRI had the right to control the board.

124.   For a majority of the period of time, through approximately 2009, each Association each year named Proulx as the President of each Association until 2009.

125.   Even though LRI did not have the legal authority to control the boards of the Associations from 2009 and thereafter, Proulx still effectively chose who would run for the boards.

126.   At all times relevant herein, Proulx, by controlling the majority of the votes in the Associations through proxies, effectively solely determined who would be on the boards and in which offices.

127.   Each Association creates a pro rata sharing of expenses to maintain the entire respective Property.

128.   Each Association also creates a pro-rata sharing of proceeds upon the ultimate disposition of the entire Property.

129.   This disposition can occur only if the vote of 60% of the undivided interests in a Property choose to sell an entire Property.

130.   Since Proulx effectively controls a majority of the votes through proxies, Proulx effectively can block any sale of an entire Property.

131.   I own an undivided interest in real property commonly referred to as LandBank 008, which was sold to me by Land Resource Investments, Inc.

1

2

3        132.   I, Ralph Stephen Coppola, the named Plaintiff herein, declare under penalty of

4              perjury of law that the foregoing is true and correct, to the best of my knowledge,

5              information and belief, and that if called to testify I would testify to the same.

6   Dated:                                          Thursday, July 14, 2011

7

8

9

10                                                  Ralph Stephen Coppola

11                                                  Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### CERTIFICATE OF MAILING

2

3        I hereby certify that on this 14th day of July, 2011, I deposited the foregoing Affidavit in Support of Motion for

4   Partial Summary Judgment into the US Mail, Postage prepaid, addressed to:

5

6   Robert A. Koenig
    Ryan Kerbow
7   Alessi & Koenig, LLC
    9500 W. Flamigo, Suite 205
8   Las Vegas, NV 89147

9

10

11

12                                        Ralph Stephen Coppola

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28