

FILED ✓     RECEIVED ___
ENTERED ___     SERVED ON ___
COUNSEL/PARTIES OF RECORD

JUL 2 1 2011

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

1    **Ralph Stephen Coppola**
     **4785 Rio Pinar Drive**
2    **Reno, NV 89509**
     **Pro Se**
3    **775 827 2344**

4

            UNITED STATES DISTRICT COURT
5             DISTRICT OF NEVADA - RENO

6    **RALPH STEPHEN COPPOLA,**     )    **CASE NO.:**    **3:2011cv00074**
           **and**            )
7    **DOES I to XX,**             )    **MOTION TO AMEND**
         **Plaintiffs**        )    **MOTION FOR PARTIAL**
8                    )    **SUMMARY JUDGEMENT**
           **vs.**            )    **AND**
9                    )    **AMENDED**
   **DARREN K. PROULX, LAND**    )    **MOTION FOR PARTIAL**
   **RESOURCE INVESTMENTS,**     )    **SUMMARY JUDGEMENT**
10   **INC., LAND RESOURCE**      )
   **MANAGEMENT, INC., and**     )
11   **MARINA COMMERCIAL OFFICES, LLC)**
           **and**            )
12   **DOES I to XX,**             )
         **Defendants**      )
13   ------------------------------------

14

15             I. **MOTION, INTRODUCTION and ISSUES.**

16    1.   COMES NOW, Ralph Stephen Coppola, the named Plaintiff, herein, (hereinafter

17        "Coppola") who hereby respectfully files this Motion to Amend Motion for Partial

18        Summary Judgment and Amended Motion for Partial Summary Judgment ("Pleading"),

19        pursuant to Fed.R.Civ.P. 56, and LR 15-1, on the first cause of action filed in Coppola's

20        First Amended Complaint, filed by Coppola against defendants Darren K. Proulx

21        ("Proulx"), Land Resource Investments, Inc. ("LRI"),  and Land Resource Management, Inc.

22        ("LRM") (herein after all three are jointly referred to as "Selling Defendants").  No

23        responsive filing has been made by any defendant to Plaintiff Coppola's Motion for Partial

24        Summary Judgment ("Original Motion").  Plaintiff Coppola also respectfully requests that

25        other requests for relief in the Original Motion be withdrawn without prejudice.

26    2.   The first of two central issues presented by this Pleading is whether an undivided real

27        estate interest (the "Investment") as sold by the Selling Defendants is a "security" as that

28        term is defined for purposes of both The Securities Act of 1933 (the "1933 Act") and The

Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 77b(a)(1), 15 U.S.C. § 77b(a)(1).

3.  The second issue presented by this Pleading is whether Selling defendants failed to register that Investment (if it is a security) as registration is required by the 1933 Act, 15 U.S.C. § 77e(c), and thereafter sold and delivered such Investments without a registration statement as required by the 1933 Act, 15 U.S.C. § 77e(a)(2).

4.  The general facts which follow should be read in light of the reason Congress enacted the 1933 Act and the 1934 Act (jointly, the "Securities Acts") to require registration and registration statements is to "substitute a philosophy of full disclosure for the philosophy of caveat emptor." SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186 (1961). Thus, "[o]ne of the [Securities Acts'] central purpose is to protect investors through the requirement of full disclosure by issuers of securities ...." *Tcherepnin v Knight*, 389 U.S. 332, 336 (1967), see, also, *SEC v Ralston Pruina Co.*, 346 U.S. 119, 124 (1953) (the design of the statute is to "protect investors by promoting full disclosure of information thought necessary to [make] informed investment decisions"); *Santa Fe Industries, Inc. v Green*, 430 U.S. 462, 477-478 (1977) ("the Court repeatedly has described the 'fundamental purpose' of the Act is to implement a 'philosophy of full disclosure ....'" (quoting, *SEC v. Capital Gains Research Bureau, supra*, at p. 186).

## II.   Facts Relevant to This Motion.

1.  During the late 1990's, Defendant Proulx , who is the current CEO and sole shareholder of both Defendants LRI and LRM, was a builder who did work on occasion for Richard "Dick" Ramsey ("Ramsey"). At some time during or before 1999, Ramsey incorporated Land Resource Concepts, Inc. ("LRC"). In 1999, the California Department of Real Estate ["DRE"] issued a Public Report to LRC allowing LRC to subdivide property located in California into a subdivision consisting of equal undivided interests (each such undivided interest is an "Investment"). Shortly thereafter, Ramsey sold LRC to Proulx. Thereafter

LRC was renamed LRI.  [Admitted by Defendants, in ANSWER OF DEFENDANTS DARREN K. PROULX, LAND RESOURCE INVESTMENTS, INC., LAND RESOURCE MANAGEMENT, INC. and MARINA COMMERCIAL OFFICES, LLC, filed on June 6, 2011 (the "Answer"), p. 1, l. 23, referring to Plaintiff's First Amended Complaint For Damages, filed on April 14, 2011 ("Complaint") in paragraph 17; Affidavit ¶ 13.]

2.  The Public Report for each Property contains, in a section entitled "Special Notes," a disclosure that no representations may be made by subdivider or agent that a Property has investment merit, future appreciation potential or may be used for any purpose.  [Affidavit ¶ 14.]

3.  Selling Defendants were or still are in the business of selling to investors "LandBank" interests consisting of undivided real estate interests (Investments).  [Affidavit ¶ 15.]

4.  The Selling Defendants describe "LandBanking" generally as "the process of buying and then holding real estate located in the path of urban growth for future sale."  [Affidavit ¶ 16.]

5.  LRI is engaged in a business that it characterizes as "making LandBanking available to the average person."  [Affidavit ¶ 17.]

6.  LRI purchases or options real estate that is typically used for farming, in or near Lancaster, California.  Such real estate is then either further subdivided into sellable parcels or marketed by itself. The marketable real estate shall be referred to as a "Property."  [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 16; Affidavit ¶ 18.]

7.  Each Property is then further subdivided into multiple undivided real estate interests (Investments), ranging from 32 Investments in one project to 300 in another.  [Affidavit ¶ 19.]

8.  There are 17 such projects or "Properties."  [Affidavit ¶ 20.]

9.  A Property is generally leased as farm real estate after LRI's purchase.  The initial lease is for five years at ONE DOLLAR ($1.00) per year with options to extend on a yearly basis thereafter.  After the fifth year, the lease may be terminated if a Property is sold by an

Association, but the tenant has certain rights to complete its operations for a given year. [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 48; Affidavit ¶ 21.]

10. The economic effect of the leases was to allow Selling Defendants or their associates to purchase each Property for less than they otherwise would have paid, because, essentially, the discounted lease amount offsets the discounted purchase price for the Property. [Affidavit ¶ 22.]

11. Although the leases were disclosed to investors, the economic effect was not disclosed to the investors. [Affidavit ¶ 22.]

12. At the time of subdivision of each Property into multiple undivided interests, certain covenants, conditions and restrictions ("CC&Rs") were overlaid on each Property by or on behalf of Selling Defendants or their associates. [Affidavit ¶ 23.]

13. Selling Defendants incorporate a California non-profit mutual benefit corporation ("Association") that is prescribed by such CC&S. [Affidavit ¶ 24.]

14. LRI, as incorporator of each Association, adopts the original Bylaws for each Association. As set forth in Section 1.21 of the [CC&Rs], and incorporated into the Bylaws, Section 1.4 of the Bylaws, the Members of Record of the Association consist of "any person, firm, corporation or other entity in which title to a Property Interest is vested as shown by the Official Records of the Office of the County Recorder." [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 39; Affidavit ¶ 25.]

15. Section 3.1, entitled, Purposes and Powers, "[t]he Association is formed to provide a mechanism to acquire the Property, assess the Members the requisite amounts to maintain the Property and pay the real estate taxes and assessments. The Association shall have neither power nor authority to improve the Property or to develop the Property." [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 46; Affidavit ¶ 26.]

16. As of the time of fling, LRI has sold to more than 1,400 individual Investors holding approximately 2,000 Investment interests in approximately 17 projects. [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 18; Affidavit ¶ 27.]

17. All sales and their delivery thereof of the Investments are carried out or caused to be carried out through the mails or in interstate commerce, by any means or instruments of transportation. [Affidavit ¶ 28.]

18. The "list" price to purchase an Investment was:

$8,500 to $10,900 for 272 Investments,

$13,500 to $14,500 for 200 Investments,

$15,000 to $18,000 for 1,000 Investments, and

$18,000 to $20,000 for 1,000 Investments.

[Affidavit ¶ 29.]

19. Gross initial-investment from the Investors and gross proceeds to the Selling Defendants is estimated to be approximately $41,000,000.00. [Affidavit ¶ 30.]

20. No registration was made pursuant to 15 U.S.C. § 77e(a)(2) with respect to any Investment. [Affidavit ¶ 31.]

21. No registration statement was provided upon delivery of any Investment as required by 15 U.S.C. § 77e(c). [Affidavit ¶ 32.]

22. Originally LRC and then LRI both (1) sold the Investments to the investors, and, after the close of escrow for each Property, then (2) also managed the respective Association created by LRC or LRI to manage each respective Property. [Affidavit ¶ 33.]

23. In approximately 2010, LRM was formed to and in fact did commence management of the Associations, instead of LRI. [Affidavit ¶ 34.]

24. Since there are 17 active Properties, and each has its own respective Association, there are 17 active Associations. [Affidavit ¶ 35.]

25. Each purchaser of a Interest [Investment] receives a traditional recorded grant-deed evidencing the ownership of a Investment in a Property. Each grant deed gives the Association an irrevocable power of attorney with regard to purchaser's Investment. One

purpose of the irrevocable power is to allow for an orderly and timely transfer of ownership of 100% of the Investments in a particular Property upon the vote of the super majority of members to sell. [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 47; Affidavit ¶ 36.]

26. The Associations include but may not be limited to the following (with date of incorporation in California set forth in parenthesis): Cal Land Resources I Association, Inc. (03/02/1999), California Land Resources II Association, Inc. (03/02/1999), Cal Land Resources III Association, Inc. (03/02/1999), Cal Land Resources IV Association, Inc. (03/22/2001), Cal Land Resources V Association, Inc. (03/22/2001),          Cal Land Resources VI Association, Inc. (03/22/2001), Cal Land Resources VII Association, Inc. (03/22/2001), Cal Land Resources VIII Association, Inc. (01/12/2004), Cal Land Resources IX Association, Inc. (01/12/2004), Cal Land Resources X Association, Inc. (01/12/2004), Cal Land Resources XI Association, Inc. (01/12/2004), Cal Land Resources 033 Association, Inc. (09/28/2005), Cal Land Resources 034 Association, Inc. (09/28/2005), Cal Land Resources 008 Association, Inc. (12/08/2005), Cal Land Resources 1011 Association, Inc. (12/08/2005), Cal Land Resources 027 Association, Inc. (01/25/2006), Cal Land Resources 073 Association, Inc. (04/04/2007), Cal Land Resources 1718 Association, Inc. (10/10/2007 ~ Dissolved), Cal Land Resources 1920 Association, Inc. (10/10/2007 ~ Dissolved), Cal Land Resources 009 Association, Inc. (04/04/2008). [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 30; Affidavit ¶ 37.]

27. Plaintiff Coppola purchased and still owns one interest in Landbank 008, which is managed by Cal Land Resources 008 Association, Inc. [Affidavit ¶ 38.]

28. The purported purpose for each Association is to allow the purchasers of the Investments a mechanism for them to coordinate the management of all Investments which constitute each Property. [Affidavit ¶ 39.]

29. By virtue of the CC&Rs, each Investment includes one membership interest in the respective Association. The Investors use the respective Association to provide and coordinate certain services such as paying property taxes, buying insurance, paying for

accounting and tax services, keeping a Property free of weeds, leasing the Property and determining if and when to sell a Property. The owners are responsible to pay a pro-rata share of the dues of the Association. The CC&Rs specifically preclude the Investors, respective Association, or any other party from developing or improving a Property in any way, or from otherwise enhancing a Property's value. It is strictly to be held in the same condition that existed as at the time of acquisition from LRI. However, in the case of one LandBank, LandBank III, after holding the parcel for a few years, 100% of the Investors voted to change the bylaws and CC&Rs to allow for seeking final map status. [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 35; Affidavit ¶ 40.]

30. Each Association also provides an organizational structure for the Investor to sell the entire Property (i.e. sixty percent of the Investors may elect to sell the entire Property) rather than just their individual Investment. [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 41.]

31. The Association for each Property is theoretically independent of the Associations for each other Property, but in practice they have been jointly managed by the Selling Defendants, with the exception of a Property known as Land Bank III, which has required and received additional separate management. [Affidavit ¶ 42.]

32. Historically, all of the Associations have retained LRI to manage the Properties and Associations, such as the collection of dues, the payment of property taxes and the planning of the annual meetings; however, the are theoretically free to engage any entity to perform such functions or to perform them "in house." [Affidavit ¶ 43.]

33. However, significantly, in practice, Defendant Proulx so controls the voting through proxies that there has not been a change away from his companies as managers. [Affidavit ¶ 44.]

34. Selling Defendants have organized each annual meeting of each Association. [Affidavit ¶ 45.]

35. The annual meetings of each Association were historically batched together into a set of meetings over one weekend in the same seminar room as organized by Selling

Defendants, although the 2011 meetings were all held jointly at the same time in the same room, as organized by the Selling Defendants. [Affidavit ¶ 46.]

36. While at the time of the final closing for a Property, LRI has sold all Investments to third parties and therefore owns no Investment in a Property, in practice, after close of escrow, LRI, as a beneficiary of a mortgage, reacquires a Investments through foreclosure when an Investor has failed to make their monthly payment as outlined in the purchase promissory note. [Affidavit ¶ 47.]

37. One or more of Selling Defendants other than LRM have has acquired Investments for their own accounts. [Affidavit ¶ 48.]

38. Subject to the provisions of the California Nonprofit Mutual Benefit Corporation Law, and applicable Regulations of the DRE and any limitations contained in any of the Bylaws and CC&Rs ("Governing Documents") relating to action required to be approved by the Members, the business and affairs of the Association shall be vested in and exercised by, the Association's Board of Directors. The "Board may delegate the management of the activities of the Association to any person or persons, management company or committee, provided that notwithstanding any such delegation the activities and affairs of the Association shall continue to be managed and all Association powers shall continue to be exercised under the ultimate direction of the Board." (Section 7.1). The Board may "[a]ppoint such agents and employ such other employees, including attorneys and accountants, as it sees fit to assist in the operation of the Association, and to fix their duties and to establish their compensation." (Section 9.1(c)). "The Board may, from time to time, employ the services of a manager to manage the affairs of the Association and, to the extent not inconsistent with the laws of the State of California, and on such conditions as are otherwise deemed advisable by the Board, the Board may delegate to the manager any of its day-to-day management and maintenance duties and powers under these Bylaws and the Declaration, provided that the manager shall at all times remain subject to the general control of the Board." (Section 15.1). [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 41; Affidavit ¶ 49.]

39. However, in practice Defendant Proulx has, until the shareholders meeting held in 2009, been the sole president of each Association and controlled the Directors of each Association.  [Affidavit ¶ 50.]

40. Each purchaser of a Interest receives a traditional grant deed evidencing the ownership of a Investment in a Property.  Each grant deed is recorded with the county upon close of the purchase escrow.  Each grant deed gives the Association an irrevocable power of attorney with regard to purchaser's Investment.  The purpose of the irrevocable power is to allow for an orderly and timely transfer of ownership of 100% of the Investments in a particular Property upon the vote of the super majority of members to sell.  [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 47; Affidavit ¶ 51.]

41. Selling Defendants represented that by purchasing an undivided real estate interest, individuals are able to participate in LandBanking a much larger piece of real estate than they might otherwise be able to afford based solely upon their individual buying power.  [Affidavit ¶ 52.]

42. An important role of both LRI and LRM in managing the Associations was pitching further sales.  [Affidavit ¶ 53.]

43. While the Selling Defendants utilized newspaper ads, radio ads and other forms of advertising, the great majority of sales occurred through word of mouth advertising which was then  used to funnel potential Investors to dinner seminars at which the Investments were pitched.  [Affidavit ¶ 54.]

44. Many of these seminars were pitched in languages other than English, to people who did not speak English, but the sales documents for the Investments were in English with no cross-checking on the represented facts. [Affidavit ¶ 55.]

45. Until approximately 2008 the publicly available representations made to potential Investors explicitly included such representations as that the projects were a "proven plan of real estate investment" and having a "high future profit potential." [Affidavit ¶ 56.]

46. On April 29, 2008, The Department of Real Estate filed a complaint against LRI and its former attorney, now deceased, George R. Kucera, of advertising "between April 11, 2006

and on or about August 31, 2007," that included representations of the Subdivision being a "proven plan of real estate investment" and having a "high future profit potential," which advertising was "false and misleading," and constituted the substantial misrepresentation of material fact." Upon information and belief, and thereupon it is alleged, that such time period was the time period during which LandBank 008 was for sale. [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 59; Affidavit ¶ 57.]

47. On July 17, 2008, the California Department of Real Estate filed against LRI an Order to Desist and Refrain from "causing to be published advertisements which include statements or representations which are false, misleading or deceptive in violation of Section 11022 of the Code." [Admitted by Defendants in Answer, p. 1, l. 24., referring to Complaint ¶ 61; Affidavit ¶ 58.]

48. From and after some time in 2008 Selling Defendants changed their public advertising to conform to the requirements of their real estate and subdivision licensing. [Admitted by Defendants in Answer, p. 1, l. 24., referring to Complaint ¶ 63; Affidavit ¶ 59.]

49. However, from then after Selling Defendants also maintained a parallel, secret, and guarded advertising programs that were shown or delivered only to certain trusted associates of LRI and potential purchasers of Investments. [Affidavit ¶ 60.]

50. Plaintiff Coppola was not aware of such programs until a few days prior to his resignation as counsel to Selling Defendants in May, 2010. [Affidavit ¶ 61.]

51. From and after some date in the 1990s, through at least 2010, Selling Defendants allowed certain trusted salespeople and their associations to maintain websites not utilizing the name of the Selling Defendants, but which contained advertising material that was prohibited by the DRE and which were used to reach a broader audience than advertising allowed by the DRE. [Affidavit ¶ 62.]

52. The prospective purchasers were then funneled to Selling Defendants. [Affidavit ¶ 63.]

53. As late as February 29, 2009, the Selling Defendants ran radio advertisements in which Defendant Proulx stated that the public reports allow a "unique ownership investment,"

that investors could make great profits in LandBanking, that an investment in land can result in impressive profits for the savvy investor and that the objective of LandBanking is appreciation in value of the land, all for the purposes of monetary gain by investors. [Affidavit ¶ 64.]

54. As late at May, 2010, the Selling Defendants ran video advertisements in which it the overriding theme is that Defendant LRI operates its LandBanking business so that purchasers of interests are investors, and that the purpose of investing in such business is to realize profit or appreciation, since "LandBanking is all about investment." [Affidavit ¶ 65.]

55. In making sales of the Investments, the Selling Defendants presented that the land in Lancaster (where the Properties are located) would be a very productive "investment," because it was a developing expanding place, and that it is "it is best to buy 'now' so that it could be sold for the most profit." [Affidavit ¶ 66.]

56. At the time of the sale of many of the Investments, the Selling Defendants, and, thereafter, the Defendant Proulx, consistently assured potential purchasers of the Investment that Selling Defendants would manage the property so that they would not have to worry about management or management decisions. [Affidavit ¶ 67.]

57. The capital that is used to conduct operations of the Association (i.e. pay taxes, insurance, accounting, etc.) is not part of any initial purchase of the Investments. Rather, each of the Associations creates a budget and assesses members for their pro rata share of expenses. [Affidavit ¶ 68.]

58. An individual Investor is powerless by himself or herself to affect the amount of dues that are imposed. [Affidavit ¶ 69.]

59. Each Associations create a pro rata sharing of expenses among that Association's members to maintain the entire respective Property. [Affidavit ¶ 70.]

60. That Association also creates a pro-rata sharing of proceeds, when the central purpose of the Investment is made: the ultimate disposition of the entire Property. [Affidavit ¶ 71.]

61. This disposition can occur only if the Investors holding 60% of the Investments in a Property choose to sell an entire Property.  [Affidavit ¶ 72.]

62. Selling Defendants make money not only from the initial sale of an Investment, but from at least six other revenue streams which are from: (1) providing services to the Associations for the management of the Associations,  (2) interest income on the Investments that were purchased in whole or in part with a mortgage on the Investment, (3) profit from the resale of Investments foreclosed upon when investors fail to service such debt, (4) charging members of the Associations for a newspaper owned  by the Selling Defendants, (5) providing engineering services to obtain final map status for a Property, and (6) providing services as a licensed real-estate agent to market and sell a Property.  [Affidavit ¶ 73.]

### III. Summary Judgment Standard.

Summary judgment is appropriate when the movant can demonstrate that the pleadings, depositions, affidavits, and other evidence available to the court establish no genuine issue of material fact. Fed. R. Civ. P. 56(c). Once the movant has met its burden, the nonmovant must demonstrate that there are fact issues warranting a trial. Fed. R. Civ. P. 56(e). In opposing summary judgment, the nonmoving may not rely on conclusory allegations in his pleadings; rather, he must set forth sufficient evidence supporting a claimed factual dispute to require a fact finder to resolve the parties' differing versions of the truth at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  If the nonmovant fails to make a showing on an element for which he bears the burden of proof, the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence must be viewed in a light most favorable to the nonmovant. *Id*.

### IV.      LEGAL ANALYSIS

### A.      INTRODUCTION

### 1.      Definition of "Security."

-12-

1    The threshold issue triggering the application of the feral securities laws to any

2  instrument is whether such instrument satisfies the statutory definition of a "security."  See 15

3  U.S.C. §§77b(a)(1), 78c(10).  The 1933 Act defines a "security" as:

4      "the term 'security' means any note, stock, treasury stock, bond, debenture, certificate of

5      interest or participation in any profit-sharing agreement or in any oil, gas, or other

6      mineral royalty or lease, any collateral trust certificate, pre-organizational certificate or

7      subscription, transferable share, investment contract, voting trust certificate, certificate

8      of deposit for a security, any put, call, straddle, option, or privilege on any security,

9      certificate or deposit, or group or index securities (including any interest therein or based

10     on the value thereof) or any put, call, straddle, option, or privilege entered into on a

11     national securities exchange relating to foreign currency, or in general, any interest

12     commonly known as a security ...."   15 U.S.C. § 77b(a)(1).

13

14    The U.S. Supreme Court has repeatedly held that the definitions of a security in the 1933

15  Act and 1934 are virtually identical and will be treated as such in decisions dealing with the scope

16  of the term.  *Landreth Timber Co. V. Landreth*, 471 U. S. 681 (1985).  That definition, however,

17  has lead to a great deal of controversy as to what constitutes a "security."

18

19        2.    **The Form of the Title Document Is Not Controlling**.

20    What the purchasers of a Real Estate Interest receive is a grant deed to an undivided

21  interest in real estate that is recorded with the local recorder.   [Admitted by Defendants in

22  Answer, p. 1, l. 23., referring to Complaint ¶ 74.]   The fact that the manner in which title passes

23  is a grant deed in real estate is not dispositive.  The United States Supreme Court, in *SEC v. C.M.*

24  *Joiner Leasing Corporation*, 320 U.S. 344, 352-353 (1943), held that:

25      "In applying acts of this general purpose, the courts have not been guided

26      by the nature of the assets back of a particular document or offering.  The

27      test rather is what character the instrument is given in commerce by the

28      terms of the offer, the plan of distribution, and the economic inducements

1   held out to the prospect.  In the enforcement  of such an act such as this it

2   is not inappropriate that promoters' offerings be judged as being what

3   they were represented to be (footnotes omitted)."

4   Thus, although the purchaser of an Investment receives a recorded grant deed that fact

5   alone does not determine whether an Investment is a security under .

6

7   ### 3.    Naked Real Estate Transfer Is Not a Security.

8   In *SEC v. C.M. Joiner Leasing Corporation* the United States Supreme Court considered

9   whether assignments of oil leases could constitute a security.  In that case the court found that

10  there was a security because more was being sold than just the naked real estate interest.

11  Implicit in the sales efforts was the implication that the seller would develop the oil wells.  *Id*. at

12  349.  If, however, the sellers had omitted the promised development of the oil leaseholds, there

13  would have been no security.  The court stated:

14  "Undisputed facts seem to us however to establish the conclusion that

15  defendants were not as a practical matter offering naked leasehold rights.

16  Had the offer mailed by the defendants omitted the economic

17  inducements of the proposed and promised exploration well it would have

18  been a quite different proposition.  Purchasers then would have been left

19  to their own devices for realizing upon their rights.  They would have

20  anticipated waiting an indefinite time . . . "  *Id*. at 348.

21

22  What the United States Supreme Court in *SEC v. C.M. Joiner Leasing*

23  *Corporation* said would be a quite different proposition is the facts of the sale of

24  the Investments.  LRI omits all economic inducements related to the *development*

25  of the Property post-sale.  There is no promised *development*.  Rather, unlike *SEC*

26  *v. C.M. Joiner Leasing Corporation*, all that is transferred is the naked undivided

27  interest in real estate.

28

-14-

1   In the instant case, no development project is contemplated or transferred.  As stated,

2   the CC&Rs actually prohibit any development.  [Affidavit ¶ 75.]  Purchasers, based upon the

3   Governing Documents, are seemingly literally left to their own devices for realizing upon their

4   rights and can anticipate waiting an indefinite period of time to realize appreciation, if any.

5   [Affidavit ¶ 76.]  Therefore, under the analysis of *SEC v. C.M. Joiner Leasing Corporation*, without

6   more, the Investments are not a security.  It is that slight bit of "more" that continues the issue of

7   whether an Investment constitutes a security.  Arguably, that bit of "more" is the very material

8   management services provided by the Selling Defendants, as well as the control held by the

9   Selling Defendants, parallel  and equal "development" under *SEC v. C.M. Joiner Leasing*

10  *Corporation*.

11

12                          4.     Choice of Entity is Not Dispositive.

13      "The federal securities laws apply to any investment described by the broad statutory

14  definition of a 'security' unless an exemption applies. This suggests that the type of business

15  association and other aspects of the investment's external form should not matter, and that the

16  securities laws should apply whenever appropriate for the protection of investors. Indeed, the

17  Supreme Court often has expressed this view. ... [yet] 'form' must matter. ... Courts have, in fact,

18  emphasized form over substance by holding that a general partnership interest is presumptively

19  a nonsecurity, and that corporate stock is per se a security. *Form And Substance In The Definition*

20  *On Of A 'Security':" The Case Of Limited Liability Companies,* by Ribstein, Larry E, <u>Washington</u>

21  <u>and Lee Law Review</u> (Summer 1994) .

22

23      In the case of the sale of the Investments, issues surrounding the identification of the

24  form is made more difficult because while what is sold is an undivided interest in real estate

25  evidenced by a grant deed, the grant deed is subject to CC&Rs which subject the ownership of

26  the Interest to the governance of the Association. [Affidavit ¶ 77.] Any suggestion, however,

27  that the organization of the Association in a corporate form (with or without stock) determines

28  the issue was rejected by the United States Supreme Court in *United Housing Foundation, Inc. v.*

1    *Forman*, 421 U.S. 837, 848 (1975) (footnotes omitted), *citing, Tcherepnin v Knight*, 389 U.S. 332

2    (1969) and *Howey, supra,* as follows:

3    "We reject at the outset any suggestion that the present transaction, evidenced by the

4    sale of shares called 'stock,' must be considered a security transaction simply because the

5    statutory definition of a security includes the words 'any . . . stock.' Rather, we adhere to

6    the basic principles that has guided all of the Court's decisions in this area: '[i]n searching

7    for the meaning and scope of the word "security" in the Acts[s], form should be

8    disregarded for substance and emphasis should be on economic reality."

9

10   The United State Supreme Court in *United Housing Foundation, Inc*, at p. 849, went even

11   further than *Tcherepnin* and *Howey,,* citing *Church of the Holy Trinity v. United States*, 143 U.S.

12   457 (1892), as follows:

13   "[a] thing may be within the letter of the statute and yet not within the

14   statute, because not within its spirit, nor within the intention of its

15   makers."

16   Therefore, the organization of an Association as a corporation does not make an

17   Investment a security.  However, under the seminal securities case of *SEC v. Howey Co.*, 328 U.S.

18   293 (1946) the inquiry has just begun.

19

20   ## 5.  Underlying Substance of the Investment.

21   "The term 'investment contract' has been interpreted to reach 'novel, uncommon, or

22   irregular devices, whatever they appear to be ... ' (citation omitted)" *Hocking v. Mayless Dubois*,

23   885 F.2d 1449, 1455 (9th Circ. 1989)(whether transaction involving the purchase of condominium

24   unit could be considered an investment contract depended upon whether the sale and offering

25   of management services formed part of what was essentially one transaction).  Congress painted

26   with a broad brush in defining the scope of the market of investments that it wished to regulate.

27   *SEC v. Howey Co.*, 328 U.S. 293, 299 (1946).   The definition of a "security" "embodies a flexible

28   rather than a static principle, one that is capable of adaptation to meet the countless and

variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. Howey Co.*, 328 U.S. 293, 299 (1946).   The Supreme Court has concluded that the best method to protect investors is to define the term "security" in a "sufficiently broad and general terms so as to include within that definition the many types of [investment] instruments that in our commercial world fall within the ordinary concept of a security." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847-848 (1975) (quoting H.R. REP. No 73-85, at 11 (1933)). "Congress therefore did not attempt precisely to cabin the scope of the Securities Acts. Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Reeves v. Ernst & Young,* 494 U.S. 56, 61 (1990).

### B.   HOWEY TEST APPLIED TO THE INVESTMENTS

The inquiry under *SEC v. Howey Co., supra*, 328 U.S. at p. 301, considers four factors: (1) an investment; (2) into a common enterprise; (3) with an expectation of profit; and (4) to come solely from the efforts of others.   The test under *Howey* has taken on a quasi-statutory aura. See, SEC v Charles E. Edwards, 540 U.S. 389 (2004) (reversing a lower court ruling that conflicted with the *Howey* tests.  See, also,  The Ubiquitous Investment Contract, 56 R. Bar J. 15, 15 (2007), by Willis H. Riccio.  The 9th Circuit has distilled *Howey,* however, into a three-part test, essentially collapsing factors (3) and (4) together, to require "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." SEC v. Rubera, 350 F.3d 1084, 1090 (9th Cir. 2003), see also,  Warfield v Aianiz, 569 F.3d 1015 (9th Circ. 2009).

### 1.   An Investment of Money (Something of Value)

"This prong is rarely litigated, as proponents typically can establish an investment of something of value".   The Howey Test Turns 64: Are the Courts Grading this Test on a Curve?, Miriam R. Albert, William and Mary Business Law Review, Vol. 2:001, Article 2,  page 16, n. 65 (2011).  The "investment of money" prong of the *Howey* test "requires that the investor `commit

1   his assets to the enterprise in such a manner as to subject himself to financial loss.'" *SEC v.*

2   *Rubera,* 350 F.3d 1084, 1090 (9th Cir. 2003)  (quoting *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.

3   1976) (per curiam)). "In *Rubera,* we found this prong satisfied where investors "turned over

4   substantial amounts of money ... with the hope that [the investment managers' efforts] would

5   yield financial gains." *Warfield v Alaniz,* 569 F.3d 1015, 1021 (9th Cir. 2009) (citing Rubera, at

6   1090). Plaintiff Coppola invested some $16,000 as an investment. [Affidavit ¶ 78.]  Additionally,

7   if all approximately 1,400 investors with approximately 2,000 Investments are considered, the

8   average price to purchase an Investment has been in the $8,500 to $20,000 range, resulting in

9   gross initial investment from the Investors and gross proceeds to the Selling Defendants of

10   estimated at approximately $41,000,000.00. [Affidavit ¶ 79.]

11

12       Turning over 'something of value' is not, however, enough.  "[w]hile the subjective intent

13   of the purchasers may have some bearing on the issue of whether they entered into investment

14   contracts, we must focus our inquiry on what the purchasers were offered or promised."

15   *Warfield v Alaniz,* 569 F.3d 1015, 1021 (9th Cir. 2009).  "Accordingly, courts have frequently

16   examined the promotional materials associated with an instrument or transaction in determining

17   whether an investment contract is present." *Id.,* citing,  e.g., *SEC v. Edwards,* 540 U.S. 389, 392,

18   124 S.Ct. 892, 157 L.Ed.2d 813 (2004), *SEC v. Goldfield Deep Mines Co. of Nev.,* 758 F.2d 459, 464-

19   65 (9th Cir.1985) (relying in part on brochure's representations of profit possibility in finding ore

20   purchase reinvestment program satisfied *Howey* test); *see, also, Hocking v. Mayless Dubois,* 885

21   F.2d 1449, 1457 (9th Circ. 1989)(oral assurances should also be considered).

22

23       In *Warfield,* the Court found that the promotional materials offered or promised

24   something of value even though it was a gift annuity. *Warfield,*  at p. 1023.  In so finding, the

25   courts, in addition to the marketing materials, also considered the type of person the promoters

26   marketed to and what would attract that type of person to invest. *Id.*

27

28

The facts in this case bear out that the promotional materials (and oral statements) offered or promised something of value by the Selling Defendants to buyers of the Investments. Selling Defendants, as recently as 2010, utilized promotional materials suggesting returns on investment of some 357%.  [Affidavit ¶ 80.]  Until approximately 2008 the publicly available promotional materials and other representations made to potential Investors explicitly included such representations as that the projects were a "proven plan of real estate investment" and having a "high future profit potential." [Affidavit ¶ 81.]

On April 29, 2008, The Department of Real Estate filed a complaint against LRI and its former attorney, now deceased, George R. Kucera, of advertising "between April 11, 2006 and on or about August 31, 2007," that included representations of the Subdivision being a "proven plan of real estate investment" and having a "high future profit potential," which advertising was "false and misleading," and constituted the substantial misrepresentation of material fact." Upon information and belief, and thereupon it is alleged, that such time period was the time period during which LandBank 008 was for sale.  [Admitted by Defendants in Answer, p. 1, l. 23., referring to Complaint ¶ 59; Affidavit ¶ 64; Affidavit ¶ 82.]  As late as February 29, 2009, the Selling Defendants ran radio advertisements in which Defendant Proulx stated that the public reports allow a "unique ownership investment,"  that investors could make great profits in LandBanking, that an investment in land can result in impressive profits for the savvy investor and that the objective of LandBanking is appreciation in value of the land, all for the purposes of monetary gain by investors. [Affidavit ¶ 83.]  As late at May, 2010, the Selling Defendants ran video advertisements in which it the overriding theme is that Defendant LRI operates its LandBanking business so that purchasers of interests are investors, and that the purpose of investing in such business is to realize profit or appreciation, since "LandBanking is all about investment." [Affidavit ¶ 84.]  The overwhelming facts demonstrate that an "an investment of something of value" was made through the Investments satisfying this prong.

2.      In a Common Enterprise

(i)      Split Between Circuits

The second prong of the *Howey* test is whether the investment of money is in a "common enterprise." *Howey* did not explicitly define the term "common enterprise." According to the 9th Circuit, in *SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1134 (9th Cir. 1991), federal courts have looked for either "horizontal commonality" (multiple investors have interrelated interests in a common scheme and their fortunes are interwoven) or "vertical commonality." The 9th Circuit has defined a common enterprise as one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties. *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (including n. 7)(9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *see, also, SEC v. R.G. Reynolds Enterprises, Inc., supra* The type of "vertical commonality" adopted by the 9th Circuit has been called "strict vertical commonality." *Glenn W. Turner Enterprises, Inc.*, at p. 482. Strict vertical commonality is best understood by comparing it to "broad vertical commonality," as adopted by other courts. While both look to the connection between fortune of the investor and the fortunes of the promoter, broad vertical commonality focuses on the efforts of the promoter, merely requiring that the investor be dependent upon the promoter, while strict vertical commonality requires that the promoter benefit from the common enterprise. *SEC v Koscot interplanetary, Inc.*, 497 F. 2d 473, 478-479 (5th Cir. 1974).

(ii) Strict Vertical Commonality Exists

There is strict vertical commonality. If LRI sold Investments in one Property and then the Selling Defendants merely walked away, there would be no strict vertical commonality. While LRI initially does sell 100% of the Investments in each Property, the Selling Defendants do not then walk away. [Affidavit ¶ 85.] Rather, the Selling Defendants template is one in which their fortunes benefit not only from the management of each Association, but from the fact that by increasing the number of Associations increases the control of the Selling Defendants as

1  managers of each Association, and their profits from managing such Associations. [Affidavit ¶

2  86.] The Associations are then used as a platform to create further non-Association profit to the

3  Selling Defendants by promoting new sales of Investments in new Properties not only at the

4  annual meeting of the Associations, but through mailings throughout the year. [Affidavit ¶ 87.]

5  But, Selling Defendants make money not only from the initial sale of an Investment, but from at

6  least six other revenue streams which are from: (1) providing services to the Associations for the

7  management of the Associations, (2) interest income on the Investments that were purchased in

8  whole or in part with a mortgage on the Investment, (3) profit from the resale of Investments

9  foreclosed upon when investors fail to service such debt, (4) charging members of the

10  Associations for a newspaper owned by the Selling Defendants, (5) providing engineering

11  services to obtain final map status for a Property, and (6) providing services as a licensed real-

12  estate agent to market and sell a Property.  [Affidavit ¶ 88.]  Therefore, on the facts of this case,

13  strict vertical commonality, and therefore a "common enterprise," exists, because the Selling

14  Defendants (promoter) benefit [greatly] from the common enterprise [and have a vested interest

15  in ensuring the Selling Defendants  remain in control].

16

17                    **(iii)    Horizontal Commonality Exists**

18        The Ninth Circuit, in *Hocking v. Mayless Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989)

19  suggests that it might consider finding under this prong if "horizontal commonality" exists.

20  Briefly put, the fortunes of the individual investors are interwoven because at the time of their

21  purchase of the Investment, they cede control to the Associations to manage the Property, of

22  which the Investment is a constituent, and, significantly, should enough of the investors in an

23  Association fail to pay their dues, an individual investor can lose that investor's Investment if the

24  county forecloses on the property for taxes. [Affidavit ¶ 89.]

25

26        **3. With An Expectation Of Profits Produced By The Efforts Of Others.**

27

28

1    The third prong of the *Howey* test, as interpreted by the 9th Circuit, requires that the

2    investment of money into the common enterprise be undertaken with the expectation of profit.

3    *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301 (1946).

4

5                                    **a. With An Expectation Of Profits.**

6        The expected return on the investment must come from the enterprise, not merely from

7    additional contributions, and this return must be the principle motivation of the investors.

8    *Warfield v Alaniz*, 569 F. 3d 1084 (9th Cir. 2009).   Plaintiff Coppola purchased his Investment

9    with the expectation of profit from that Investment. [Affidavit ¶ 90.]   There is no reason to

10   purchase an Investment other than for investment purposes. [Affidavit ¶ 91.]    No investor can

11   intend to use the real estate (such as for construction, camping or fishing) that constitutes that

12   Investment, because everyone is, in fact, precluded from doing so by the Governing Documents.

13   [Affidavit ¶ 92.]   Under the Governing Documents, it would be trespassing for an individual

14   investor to enter upon a Property without permission of the governing Association. [Affidavit ¶

15   93.]    Therefore, it is presumed that the purchase of an Investment by each Doe Plaintiff also is

16   for investment purposes. This is true even though, pursuant to the Public Report issued by the

17   CA Department of Real Estate, LRI legally could not refer to "investment merit" or the potential

18   for "profit" or "appreciation" to prospective purchasers in California. [Affidavit ¶ 94.] Simply

19   put, what other motivation could there be for purchasing an Investment than "with an

20   expectation of profit"?  The potential return comes from the farm lease income and the sale of

21   each Investment. [Affidavit ¶ 95.]      The facts in this case bear out that the expected return on

22   the investment comes from the enterprise, not merely from additional contributions, and this

23   return is the principle motivation of the investors.

24

25                                    **b. Produced By The Efforts Of Others.**

26                                        **(1) <u>Not "Solely"</u>.**

27       At the onset, *Howey*:

28

1    "speaks in terms of 'profits to come solely from the efforts of others.' (Emphasis

2    supplied.) Although the issue is not presented in this case, we note that the Court of

3    Appeals for the Ninth Circuit has held that "the word 'solely' should not be read as a strict

4    or literal limitation on the definition of an investment contract, but rather must be

5    construed realistically, so as to include within the definition those schemes which involve

6    in substance, if not form, securities." *SEC v. Glenn W. Turner Enterprises*, 474 F.2d 476,

7    482, cert. denied, 414 U.S. 821 (1973). We express no view, however, as to the holding of

8    this case." *United Housing Foundation, Inc. v Forman*, 421 U. S. 837, 851 (*see* n. 16)

9    (1975).

10    ### (2) "A Material Impact Upon The Profits Of The Investors".

11

12

13    The second part of the third and final prong of *Howey*, as characterized by the Ninth

14    Circuit, is "whether the efforts made by those other than the investor are the undeniably

15    significant ones, those essential managerial efforts which affect the failure or success of the

16    enterprise." *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), cert. denied,

17    414 U.S. 821 (1973) .

18

19    This case, on the surface, involves real estate interests.  Of significance, then, is that, "[t]he

20    obligation to perform minimal managerial functions or to provide basic improvements does not

21    transform a real estate sale into a securities transaction." *Aldrich v. McCulloch Properties, Inc.*,

22    627 F.2d 1036, 1040 (10th Cir. 1980).  The real burden of management, even by the most liberal

23    tests, must rest on the promoters. See *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298 (1946);

24    *Woodward v. Terracor*, 574 F.2d at 1026; *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476,

25    482 (9th Cir.), cert. denied, 414 U.S. 821 (1973).  That the efforts made by those other than the

26    investor are the undeniably significant ones, those essential managerial efforts which affect the

27    failure or success of the enterprise (management), however, can be shown to rest on the

28    promoters, the Selling Defendants, in this case.

1   In order to satisfy the remainder of the third prong of the Howey test (under the 9th Circuit

2   formulation), courts have consistently emphasized that the efforts put forth by the promoter,

3   seller or other third parties must be more than mere "ministerial" functions.  To understand how

4   minimal the actions of the promoters must be to remain "ministerial," guidance can be gained

5   from *SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996).  In *Life Partners, Inc.* individuals were

6   offered fractional interests in insurance policies by Life Partners, Inc. ("Life Partners").

7   Purchasers investing in the policy of an insured that died quickly would make more money on

8   their investment, whereas purchasers investing in someone who lived longer would make less.

9   After the sale of an interest, Life Partners would perform certain ministerial functions, such as

10   paying fees and having the ability to change the designated beneficiary. These duties were

11   described as "clerical and routine."  On that basis, *Life Partners, Inc.* held that the interests were

12   not securities.  The court pointed out that performing these ministerial functions *did not add*

13   *value to the investment.*  There must be an "association between the profits of the investors and

14   the 'efforts' of the promoter." *Id*. at 545.  Ministerial functions, the court noted, "should receive

15   a good deal less weight than entrepreneurial activities." *Id*. at 548.  Since none of the ministerial

16   functions had "a material impact upon the profits of the investors," the investments were not

17   securities. *Ibid.*

18

19   The instant case is vastly different.  In making many of the sales of the undivided real estate

20   interests the Selling Defendants consistently assured potential purchasers of the Investment that

21   he would manage the property so that they would not have to worry about its management or

22   management decisions. [Affidavit ¶ 96.]  This is borne out in practice.

23

24   The Associations have always provided complete management and control of the Properties,

25   including, but not limited to, weed abatement, seeking potential buyers for the Property, selling

26   the Property, organizing all investor communications, organizing all investor meetings, organizing

27   all board meetings, providing a mechanism for voting on all management issues concerning the

28   Property, providing information on the investment at annual meetings, ensuring all legal

1  compliance, suggesting whether certain Associations seek "final-map status" with the county to

2  enhance value, effectively determining what vendors Associations will deal with, and paying

3  property taxes to prevent a tax-sale.  In turn the Associations are completely controlled by the

4  Selling Defendants through the proxy process.  [Affidavit ¶ 97.]    On these facts, "the efforts

5  made by those other than the investor are the undeniably significant ones, those essential

6  managerial efforts which affect the failure or success of the enterprise" as required by *SEC v.*

7  *Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), cert. denied, 414 U.S. 821 (1973) .

8

9       However, it is not enough to find the efforts made by those other than the investor are

10  the undeniably significant ones.  Rather, it is often repeated that the timing of that finding is

11  upon the original agreement between the parties and not how in fact the entity function in

12  carrying out its business affairs.  *Reeves v. Teuscher*, 881 F.2d 1495, 1500 (9th Cir. 1989)

13  (discussing whether a general partnership could be considered a security).  The "court is 'limited

14  to assessing the expectations of control at the inception of the investment' but post-investment

15  actions may indicate what those expectations were."  *SEC v Merch. Capital, LLC,* 483 F.3d 747,

16  760 (11th Cir. 2007), *citing Williamson v.Ttucker*, 645 F.2d 404, 424 n. 14 (5th Cir 1981).

17

18       Note, however, that "[a]s courts have held, 'the mere choice . . . to remain passive is not

19  sufficient to create a security interest.'"  *Endico v. Fonte*, 485 F. Supp. 2d 411, 415 n 16 (S.D.N.Y.

20  2007), citing *Rivanna Trawlers Unlimited v. Thompson Trawlers*, 840 F.2d 236, 240-41 (4th Cir.

21  1988).  "[W]here the investor maintains legal control over his investment (or the ability to regain

22  control), in order to claim the investment is a security he must show practical dpendence, and an

23  inability to exercise meaningful powers of control or to find others to manage his investment.

24  *Hocking v. Mayless Dubois*, 885 F.2d 1449, 1460 (9th Circ. 1989)(citations omitted).  Significantly,

25  in practice, Defendant Proulx so controls the voting through proxies that there has not been a

26  change away from his companies as managers.  [Affidavit ¶ 98.]  All decisions made at the

27  annual meetings of each Association (other than board selection) have historically effectively

28  been made prior to the investors even arriving to vote because Defendant Proulx controls over

1   50% of the voting power through proxies.  [Affidavit ¶ 99.]   Individual investors are powerless to

2   effect change.  [Affidavit ¶ 100.]  An individual Investor is powerless by himself or herself to

3   affect the amount of dues that are imposed.   [Affidavit ¶ 101.]  A disposition can occur only if

4   the Investors holding 60% of the Investments in a Property choose to sell an entire Property.

5   [Affidavit ¶ 102.]  Since Proulx effectively controls a majority of the votes through proxies, Proulx

6   effectively can block any sale of an entire Property.  [Affidavit ¶ 103.]  Selling Defendants

7   control the annual meetings of the investors.  [Affidavit ¶ 104.]   Until 2010, Proulx has

8   controlled the Directors of each Association.   [Affidavit ¶ 105.]  For a majority of the period of

9   time, through approximately 2009, each Association each year voted Proulx as the President of

10   each Association until 2009.   [Affidavit ¶ 106.]

11

12        Even if Proulx did not so control the voting, the majority of the owners of interests are

13   "inexperienced and unknowledgeable members of the general public," because Selling

14   Defendants target sales at people without investment expertise, and, often, without any other

15   investment experience.  [Affidavit ¶ 107.]  Whether because the individual investors simply have

16   no control, or because, even if they did have some power, they are "inexperienced and

17   unknowledgeable members of the general public"  the individual investors would not be deemed

18   capable of exercising control.  See, also, Hocking v. Mayless Dubois, at pp. 1460-1461.

19

20        Most of the cases finding a real estate transaction to involve a security have been direct

21   offerings from a developer that include collateral agreements.  Hocking v. Mayless Dubois, 885

22   F.2d 1449, 1457 (9th Circ. 1989).  In the instant case, the fact that the promise of management

23   expertise existed and would be provided at the time of contract formation, is best shown by the

24   fact that in making sales of the Investments, the Selling Defendants presented that the land in

25   Lancaster (where the Properties are located) would be a very productive "investment," because

26   it was a developing expanding place, and that it is "it is best to buy 'now' so that it could be sold

27   for the most profit."  [Affidavit ¶ 108.]  That representation, had already been made prior to the

28   contract formation.  [Affidavit ¶ 109.]   At the time of the sale of many of the Investments, the

1   Selling Defendants, and, thereafter, the Defendant Proulx,  consistently assured potential

2   purchasers of the Investment that he would manage the property so that they would not have to

3   worry about management or management decisions.  [Affidavit ¶ 110.]  The post contract-

4   formation actions of the Selling Defendants described, *infra*, have been so consistent that no

5   other inference can be drawn but that it was the expectation of all parties upon time of contract

6   formation that efforts made by Selling Defendants, rather than the investors, would be the

7   undeniably significant ones.  Even if that had not been the expectation of any particular investor,

8   because Proulx so controls the Associations, that can be the only outcome, thus satisfying this

9   prong.

10

11                                 **C.      HOWEY'S LEGACY**

12

13          Should at this point in the inquiry there be any doubt left that the Investment is a

14   "security" requiring registration, the Supreme Court, in *Reeves v. Ernst & Young*, 494 U.S. 56, 61

15   (1990), noted that "Congress' purpose in enacting the securities laws was to regulate

16   investments, in whatever form they are made and by whatever name they are called," and to

17   that end, the Court found that congress enacted a broad definition of "security," sufficient "to

18   encompass virtually any instrument that might be sold as an investment."

19

20                                 **V.      Damages.**

21          As a proximate result of the conduct of Selling Defendants as herein alleged, Plaintiff

22   Coppola has incurred damages in at least the sum in excess of the jurisdictional amount of this

23   Court, and additional amounts according to proof at time of trial, and which include

24   compensatory and punitive damages and legal fees.  [Affidavit ¶ 111.]

25

26

27

28

VI.   **Prayer for Relief.**

Wherefore, for the reasons stated in this pleading, Plaintiff Coppola respectfully hereby moves for summary judgment, pursuant to Fed.R.Civ.P. 56, on all the first Count filed against the Selling Defendants, namely that the court find:

1. An undivided real estate interest (the "Investment") sold by the Selling Defendants is a "security" as that term is defined for purposes of both The Securities Act of 1933 (the "1933 Act") and The Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 77b(a)(1), 15 U.S.C. § 77b(a)(1), and,

2. That the Selling defendants failed to register that Investment (if it is a security) as registration is required by the 1933 Act, 15 U.S.C. § 77e(c), and thereafter sold and delivered such Investments without a registration statement as required by the 1933 Act, 15 U.S.C. § 77e(a)(2).

Dated:                                              Thursday, July 21, 2011


_____

Ralph Stephen Coppola
Plaintiff

## CERTIFICATE OF MAILING

I hereby certify that on this 21st day of July, 2011, I deposited the foregoing Affidavit in Support of Motion for Partial Summary Judgment into the US Mail, Postage prepaid, addressed to:

Robert A. Koenig
Ryan Kerbow
Alessi & Koenig, LLC
9500 W. Flamigo, Suite 205
Las Vegas, NV 89147

Ralph Stephen Coppola