```
____ FILED          ____ RECEIVED
____ ENTERED        ____ SERVED ON
        COUNSEL/PARTIES OF RECORD

        JUL 2 1 2011

    CLERK US DISTRICT COURT
    DISTRICT OF NEVADA
                        DEPUTY
```

1  **Ralph Stephen Coppola**
   **4785 Rio Pinar Drive**
2  **Reno, NV 89509**
   **Pro Se**
3  **775 827 2344**

4
                    UNITED STATES DISTRICT COURT
5                    DISTRICT OF NEVADA - RENO

6  **RALPH STEPHEN COPPOLA,**          **CASE NO.:**    **3:2011cv00074**
            **and**
7  **DOES I to XX,**
        **Plaintiffs**                 **AFFIDAVIT IN SUPPORT OF**
8                                       **AMENDED MOTION FOR PARTIAL**
            **vs.**                     **SUMMARY JUDGEMENT**
9
   **DARREN K. PROULX, LAND**
10 **RESOURCE INVESTMENTS,**
   **INC., LAND RESOURCE**
   **MANAGEMENT, INC., and**
11 **MARINA COMMERCIAL OFFICES, LLC)**
            **and**
12 **DOES I to XX,**
        **Defendants**
13 ------------------------------------

14  1. COMES NOW, Ralph Stephen Coppola, the named Plaintiff, herein, (hereinafter
15     "Coppola") who being duly sworn, depose and say;

16  2. Coppola does make the following affirmation under penalty of perjury;

17  3. Coppola was the Nevada State Bar licensed "in-house" counsel to defendants.

18  4. As counsel for defendants Plaintiff came into confidential information that supports
19     the allegations of this case.

20  5. Plaintiff, however, was hoping that defendants would file a responsive pleading to
21     Plaintiff's Motion for Partial Summary Judgment which would obviate the need for an
22     Affidavit disclosing confidential information.

23  6. Defendants, however, appear to have failed to file a responsive brief, which
24     responsive brief appears to have been due on Monday, July 11, 2011.

25  7. The Nevada Rules of Professional Responsibility 1.6(b) and 1.9(c) allow the
26     permissive disclosure of confidential information in limited circumstances.

27  8. Those permissive disclosures allow the using of information relating among other
28     times (a) to the representation of a formerly represented client except as the rules
       would permit, such as in the instant matter where my services were used to commit

                              -1-

a fraudulent and (b) to establish a claim in a controversy between the lawyer and the client.

9. Plaintiff was hoping to not have to rely on the permissive disclosure provisions of Nevada Rules of Professional Responsibility 1.6(b) and 1.9(c), but the apparent failure of defendants to answer requires such action.

10. Defendant Proulx at all times relevant was either or both the President or CEO of LRI.

11. Defendant Proulx at all times relevant was, without regard to community property law, the sole shareholder of LRI.

12. Defendant Proulx at all times relevant was, without regard to community property law, the sole shareholder of LRM.

13. During the late 1990's, Defendant Proulx , who is the current CEO and sole shareholder of both Defendants LRI and LRM, was a builder who did work on occasion for Richard "Dick" Ramsey ("Ramsey"). At some time during or before 1999, Ramsey incorporated Land Resource Concepts, Inc. ("LRC"). In 1999, the California Department of Real Estate ["DRE"] issued a Public Report to LRC allowing LRC to subdivide property located in California into a subdivision consisting of equal undivided interests (each such undivided interest is an "Investment"). Shortly thereafter, Ramsey sold LRC to Proulx. Thereafter LRC was renamed LRI

14. The Public Report for each Property contains, in a section entitled "Special Notes," a disclosure that no representations may be made by subdivider or agent that a Property has investment merit, future appreciation potential or may be used for any purpose. Selling Defendants were or still are in the business of selling to investors "LandBank" interests consisting of undivided real estate interests (Investments).

15. The Selling Defendants describe "LandBanking" generally as "the process of buying and then holding real estate located in the path of urban growth for future sale."

16. LRI is engaged in a business that it characterizes as "making LandBanking available to the average person."

17. LRI purchases or options real estate that is typically used for farming, in or near Lancaster, California. Such real estate is then either further subdivided into sellable

parcels or marketed by itself. The marketable real estate shall be referred to as a "Property."

18. Each Property is then further subdivided into multiple undivided real estate interests (Investments), ranging from 32 Investments in one project to 300 in another.

19. There are 17 such projects or "Properties.

20. A Property is generally leased as farm real estate after LRI's purchase.  The initial lease is for five years at ONE DOLLAR ($1.00) per year with options to extend on a yearly basis thereafter.  After the fifth year, the lease may be terminated if a Property is sold by an Association, but the tenant has certain rights to complete its operations for a given year.

21. The economic effect of the leases was to allow Selling Defendants or their associates to purchase each Property for less than they otherwise would have paid, because, essentially, the discounted lease amount offsets the discounted purchase price for the Property.

22. Although the leases were disclosed to investors, the economic effect was not disclosed to the investors.

23. At the time of subdivision of each Property into multiple undivided interests, certain covenants, conditions and restrictions ("CC&Rs") were overlaid on each Property by or on behalf of Selling Defendants or their associates.

24. Selling Defendants incorporate a California non-profit mutual benefit corporation ("Association") that is prescribed by such CC&S.

25. LRI, as incorporator of each Association, adopts the original Bylaws for each Association.  As set forth in Section 1.21 of the [CC&Rs], and incorporated into the Bylaws, Section 1.4 of the Bylaws, the Members of Record of the Association consist of "any person, firm, corporation or other entity in which title to a Property Interest is vested as shown by the Official Records of the Office of the County Recorder."

26. Section 3.1, entitled, Purposes and Powers, "[t]he Association is formed to provide a mechanism to acquire the Property, assess the Members the requisite amounts to

maintain the Property and pay the real estate taxes and assessments. The

Association shall have neither power nor authority to improve the Property or to

develop the Property."

27. As of the time of fling, LRI has sold to more than 1,400 individual Investors holding

approximately 2,000 Investment interests in approximately 17 projects.

28. All sales and their delivery thereof of the Investments are carried out or caused to be

carried out through the mails or in interstate commerce, by any means or

instruments of transportation.

29. The "list" price to purchase an Investment was:

$8,500 to $10,900 for 272 Investments,

$13,500 to $14,500 for 200 Investments,

$15,000 to $18,000 for 1,000 Investments, and

$18,000 to $20,000 for 1,000 Investments.

30. Gross initial-investment from the Investors and gross proceeds to the Selling

Defendants is estimated to be approximately $41,000,000.00.

31. No registration was made pursuant to 15 U.S.C. § 77e(a)(2) with respect to any

Investment.  [Affidavit ¶ 31.]

32. No registration statement was provided upon delivery of any Investment as required

by 15 U.S.C. § 77e(c).

33. Originally LRC and then LRI both (1) sold the Investments to the investors, and, after

the close of escrow for each Property, then (2) also managed the respective

Association created by LRC or LRI to manage each respective Property.

34. In approximately 2010, LRM was formed to and in fact did commence management

of the Associations, instead of LRI.

35. Since there are 17 active Properties, and each has its own respective Association,

there are 17 active Associations.

36. Each purchaser of a Interest [Investment] receives a traditional recorded grant-deed

evidencing the ownership of a Investment in a Property.  Each grant deed gives the

Association an irrevocable power of attorney with regard to purchaser's Investment. One purpose of the irrevocable power is to allow for an orderly and timely transfer of ownership of 100% of the Investments in a particular Property upon the vote of the super majority of members to sell.

37. The Associations include but may not be limited to the following (with date of incorporation in California set forth in parenthesis): Cal Land Resources I Association, Inc. (03/02/1999), California Land Resources II Association, Inc. (03/02/1999), Cal Land Resources III Association, Inc. (03/02/1999), Cal Land Resources IV Association, Inc. (03/22/2001), Cal Land Resources V Association, Inc. (03/22/2001), Cal Land Resources VI Association, Inc. (03/22/2001), Cal Land Resources VII Association, Inc. (03/22/2001), Cal Land Resources VIII Association, Inc. (01/12/2004), Cal Land Resources IX Association, Inc. (01/12/2004), Cal Land Resources X Association, Inc. (01/12/2004), Cal Land Resources XI Association, Inc. (01/12/2004), Cal Land Resources 033 Association, Inc. (09/28/2005), Cal Land Resources 034 Association, Inc. (09/28/2005), Cal Land Resources 008 Association, Inc. (12/08/2005), Cal Land Resources 1011 Association, Inc. (12/08/2005), Cal Land Resources 027 Association, Inc. (01/25/2006), Cal Land Resources 073 Association, Inc. (04/04/2007), Cal Land Resources 1718 Association, Inc. (10/10/2007 ~ Dissolved), Cal Land Resources 1920 Association, Inc. (10/10/2007 ~ Dissolved), Cal Land Resources 009 Association, Inc. (04/04/2008).

38. Plaintiff Coppola purchased and still owns one interest in Landbank 008, which is managed by Cal Land Resources 008 Association, Inc.

39. The purported purpose for each Association is to allow the purchasers of the Investments a mechanism for them to coordinate the management of all Investments which constitute each Property.

40. By virtue of the CC&Rs, each Investment includes one membership interest in the respective Association. The Investors use the respective Association to provide and coordinate certain services such as paying property taxes, buying insurance, paying

for accounting and tax services, keeping a Property free of weeds, leasing the Property and determining if and when to sell a Property. The owners are responsible to pay a pro-rata share of the dues of the Association. The CC&Rs specifically preclude the Investors, respective Association, or any other party from developing or improving a Property in any way, or from otherwise enhancing a Property's value. It is strictly to be held in the same condition that existed as at the time of acquisition from LRI. However, in the case of one LandBank, LandBank III, after holding the parcel for a few years, 100% of the Investors voted to change the bylaws and CC&Rs to allow for seeking final map status.

41. Each Association also provides an organizational structure for the Investor to sell the entire Property (i.e. sixty percent of the Investors may elect to sell the entire Property) rather than just their individual Investment.

42. The Association for each Property is theoretically independent of the Associations for each other Property, but in practice they have been jointly managed by the Selling Defendants, with the exception of a Property known as Land Bank III, which has required and received additional separate management.

43. Historically, all of the Associations have retained LRI to manage the Properties and Associations, such as the collection of dues, the payment of property taxes and the planning of the annual meetings; however, the are theoretically free to engage any entity to perform such functions or to perform them "in house."

44. However, significantly, in practice, Defendant Proulx so controls the voting through proxies that there has not been a change away from his companies as managers.

45. Selling Defendants have organized each annual meeting of each Association.

46. The annual meetings of each Association were historically batched together into a set of meetings over one weekend in the same seminar room as organized by Selling Defendants, although the 2011 meetings were all held jointly at the same time in the same room, as organized by the Selling Defendants.

-6-

47. While at the time of the final closing for a Property, LRI has sold all Investments to third parties and therefore owns no Investment in a Property, in practice, after close of escrow, LRI, as a beneficiary of a mortgage, reacquires a Investments through foreclosure when an Investor has failed to make their monthly payment as outlined in the purchase promissory note.

48. One or more of Selling Defendants other than LRM have has acquired Investments for their own accounts.

49. Subject to the provisions of the California Nonprofit Mutual Benefit Corporation Law, and applicable Regulations of the DRE and any limitations contained in any of the Bylaws and CC&Rs ("Governing Documents") relating to action required to be approved by the Members, the business and affairs of the Association shall be vested in and exercised by, the Association's Board of Directors.  The "Board may delegate the management of the activities of the Association to any person or persons, management company or committee, provided that notwithstanding any such delegation the activities and affairs of the Association shall continue to be managed and all Association powers shall continue to be exercised under the ultimate direction of the Board." (Section 7.1).   The Board may "[a]ppoint such agents and employ such other employees, including attorneys and accountants, as it sees fit to assist in the operation of the Association, and to fix their duties and to establish their compensation." (Section 9.1(c)).  "The Board may, from time to time, employ the services of a manager to manage the affairs of the Association and, to the extent not inconsistent with the laws of the State of California, and on such conditions as are otherwise deemed advisable by the Board, the Board may delegate to the manager any of its day-to-day management and maintenance duties and powers under these Bylaws and the Declaration, provided that the manager shall at all times remain subject to the general control of the Board."  (Section 15.1).

50. However, in practice Defendant Proulx has, until the shareholders meeting held in 2009, been the sole president of each Association and controlled the Directors of each Association.

51. Each purchaser of a Interest receives a traditional grant deed evidencing the ownership of a Investment in a Property.  Each grant deed is recorded with the county upon close of the purchase escrow.  Each grant deed gives the Association an irrevocable power of attorney with regard to purchaser's Investment.  The purpose of the irrevocable power is to allow for an orderly and timely transfer of ownership of 100% of the Investments in a particular Property upon the vote of the super majority of members to sell.

52. Selling Defendants represented that by purchasing an undivided real estate interest, individuals are able to participate in LandBanking a much larger piece of real estate than they might otherwise be able to afford based solely upon their individual buying power.

53. An important role of both LRI and LRM in managing the Associations was pitching further sales.

54. While the Selling Defendants utilized newspaper ads, radio ads and other forms of advertising, the great majority of sales occurred through word of mouth advertising which was then  used to funnel potential Investors to dinner seminars at which the Investments were pitched.

55. Many of these seminars were pitched in languages other than English, to people who did not speak English, but the sales documents for the Investments were in English with no cross-checking on the represented facts.

56. Until approximately 2008 the publicly available representations made to potential Investors explicitly included such representations as that the projects were a "proven plan of real estate investment" and having a "high future profit potential."

57. On April 29, 2008, The Department of Real Estate filed a complaint against LRI and its former attorney, now deceased, George R. Kucera, of advertising "between April 11,

-8-

2006 and on or about August 31, 2007," that included representations of the Subdivision being a "proven plan of real estate investment" and having a "high future profit potential," which advertising was "false and misleading," and constituted the substantial misrepresentation of material fact." Upon information and belief, and thereupon it is alleged, that such time period was the time period during which LandBank 008 was for sale.

58. On July 17, 2008, the California Department of Real Estate filed against LRI an Order to Desist and Refrain from "causing to be published advertisements which include statements or representations which are false, misleading or deceptive in violation of Section 11022 of the Code."

59. From and after some time in 2008 Selling Defendants changed their public advertising to conform to the requirements of their real estate and subdivision licensing.

60. However, from then after Selling Defendants also maintained a parallel, secret, and guarded advertising programs that were shown or delivered only to certain trusted associates of LRI and potential purchasers of Investments.

61. Plaintiff Coppola was not aware of such programs until a few days prior to his resignation as counsel to Selling Defendants in May, 2010.

62. From and after some date in the 1990s, through at least 2010, Selling Defendants allowed certain trusted salespeople and their associations to maintain websites not utilizing the name of the Selling Defendants, but which contained advertising material that was prohibited by the DRE and which were used to reach a broader audience than advertising allowed by the DRE.

63. The prospective purchasers were then funneled to Selling Defendants.

64. As late as February 29, 2009, the Selling Defendants ran radio advertisements in which Defendant Proulx stated that the public reports allow a "unique ownership investment," that investors could make great profits in LandBanking, that an investment in land can result in impressive profits for the savvy investor and that the

objective of LandBanking is appreciation in value of the land, all for the purposes of monetary gain by investors.

65. As late at May, 2010, the Selling Defendants ran video advertisements in which it the overriding theme is that Defendant LRI operates its LandBanking business so that purchasers of interests are investors, and that the purpose of investing in such business is to realize profit or appreciation, since "LandBanking is all about investment."

66. In making sales of the Investments, the Selling Defendants presented that the land in Lancaster (where the Properties are located) would be a very productive "investment,"  because it was a developing expanding place, and that it is "it is best to buy 'now' so that it could be sold for the most profit."

67. At the time of the sale of many of the Investments, the Selling Defendants, and, thereafter, the Defendant Proulx,  consistently assured potential purchasers of the Investment that he would manage the property so that they would not have to worry about management or management decisions.

68. The capital that is used to conduct operations of the Association (i.e. pay taxes, insurance, accounting, etc.) is not part of any initial purchase of the Investments. Rather, each of the Associations creates a budget and assesses members for their pro rata share of expenses.

69. An individual Investor is powerless by himself or herself to affect the amount of dues that are imposed.

70. Each Associations create a pro rata sharing of expenses among that Association's members to maintain the entire respective Property.

71. That Association also creates a pro-rata sharing of proceeds, when the central purpose of the Investment is made: the ultimate disposition of the entire Property.

72. This disposition can occur only if the Investors holding 60% of the Investments in a Property choose to sell an entire Property.

73. Selling Defendants make money not only from the initial sale of an Investment, but from at least six other revenue streams which are from: (1) providing services to the Associations for the management of the Associations,  (2) interest income on the Investments that were purchased in whole or in part with a mortgage on the Investment, (3) profit from the resale of Investments foreclosed upon when investors fail to service such debt, (4) charging members of the Associations for a newspaper owned  by the Selling Defendants, (5) providing engineering services to obtain final map status for a Property, and (6) providing services as a licensed real-estate agent to market and sell a Property.

74. What the purchasers of a Real Estate Interest receive is a grant deed to an undivided interest in real estate that is recorded with the local recorder.

75. As stated, the CC&Rs actually prohibit any development.

76. Purchasers, based upon the Governing Documents, are seemingly literally left to their own devices for realizing upon their rights and can anticipate waiting an indefinite period of time to realize appreciation, if any.

77. While what is sold is an undivided interest in real estate evidenced by a grant deed, the grant deed is subject to CC&Rs which subject the ownership of the Interest to the governance of the Association.

78. Plaintiff Coppola invested some $16,000 as an investment.

79. Additionally, if all approximately 1,400 investors with approximately 2,000 Investments are considered, the average price to purchase an Investment has been in the $8,500 to $20,000 range, resulting in gross initial investment from the Investors and gross proceeds to the Selling Defendants of estimated at approximately $41,000,000.00.

80. Selling Defendants, as recently as 2010, utilized promotional materials suggesting returns on investment of some 357%.

81. Until approximately 2008 the publicly available promotional materials and other representations made to potential Investors explicitly included such representations

as that the projects were a "proven plan of real estate investment" and having a "high future profit potential."

82. On April 29, 2008, The Department of Real Estate filed a complaint against LRI and its former attorney, now deceased, George R. Kucera, of advertising "between April 11, 2006 and on or about August 31, 2007," that included representations of the Subdivision being a "proven plan of real estate investment" and having a "high future profit potential," which advertising was "false and misleading," and constituted the substantial misrepresentation of material fact."  Upon information and belief, and thereupon it is alleged, that such time period was the time period during which LandBank 008 was for sale.

83. As late as February 29, 2009, the Selling Defendants ran radio advertisements in which Defendant Proulx stated that the public reports allow a "unique ownership investment," that investors could make great profits in LandBanking, that an investment in land can result in impressive profits for the savvy investor and that the objective of LandBanking is appreciation in value of the land, all for the purposes of monetary gain by investors.

84. As late at May, 2010, the Selling Defendants ran video advertisements in which it the overriding theme is that Defendant LRI operates its LandBanking business so that purchasers of interests are investors, and that the purpose of investing in such business is to realize profit or appreciation, since "LandBanking is all about investment."

85. While LRI initially does sell 100% of the Investments in each Property, the Selling Defendants do not then walk away.

86. Rather, the Selling Defendants template is one in which their fortunes benefit not only from the management of each Association, but from the fact that by increasing the number of Associations increases the control of the Selling Defendants as managers of each Association, and their profits from managing such Associations.

87. The Associations are then used as a platform to create further non-Association profit to the Selling Defendants by promoting new sales of Investments in new Properties not only at the annual meeting of the Associations, but through mailings throughout the year.

88. But, Selling Defendants make money not only from the initial sale of an Investment, but from at least six other revenue streams which are from: (1) providing services to the Associations for the management of the Associations, (2) interest income on the Investments that were purchased in whole or in part with a mortgage on the Investment, (3) profit from the resale of Investments foreclosed upon when investors fail to service such debt, (4) charging members of the Associations for a newspaper owned by the Selling Defendants, (5) providing engineering services to obtain final map status for a Property, and (6) providing services as a licensed real-estate agent to market and sell a Property.

89. The fortunes of the individual investors are interwoven because at the time of their purchase of the Investment, they cede control to the Associations to manage the Property, of which the Investment is a constituent, and, significantly, should enough of the investors in an Association fail to pay their dues, an individual investor can lose that investor's Investment if the county forecloses on the property for taxes.

90. Plaintiff Coppola purchased his Investment with the expectation of profit from that Investment.

91. There is no reason to purchase an Investment other than for investment purposes.

92. No investor can intend to use the real estate (such as for construction, camping or fishing) that constitutes that Investment, because everyone is, in fact, precluded from doing so by the Governing Documents.

93. Under the Governing Documents, it would be trespassing for an individual investor to enter upon a Property without permission of the governing Association.

94. This is true even though, pursuant to the Public Report issued by the CA Department of Real Estate, LRI legally could not refer to "investment merit" or the potential for "profit" or "appreciation" to prospective purchasers in California.

95. The potential return comes from the farm lease income and the sale of each Investment.

96. In making many of the sales of the undivided real estate interests the Selling Defendants consistently assured potential purchasers of the Investment that Selling Defendants would manage the property so that they would not have to worry about its management or management decisions.

97. The Associations have always provided complete management and control of the Properties, including, but not limited to, weed abatement, seeking potential buyers for the Property, selling the Property, organizing all investor communications, organizing all investor meetings, organizing all board meetings, providing a mechanism for voting on all management issues concerning the Property, providing information on the investment at annual meetings, ensuring all legal compliance, suggesting whether certain Associations seek "final-map status" with the county to enhance value, effectively determining what vendors Associations will deal with, and paying property taxes to prevent a tax-sale.  In turn the Associations are completely controlled by the Selling Defendants through the proxy process.

98. Significantly, in practice, Defendant Proulx so controls the voting through proxies that there has not been a change away from his companies as managers.

99. All decisions made at the annual meetings of each Association (other than board selection) have historically effectively been made prior to the investors even arriving to vote because Defendant Proulx controls over 50% of the voting power through proxies.

100.   Individual investors are powerless to effect change.

101.   An individual Investor is powerless by himself or herself to affect the amount of dues that are imposed.

-14-

102. A disposition can occur only if the Investors holding 60% of the Investments in a Property choose to sell an entire Property.

103. Since Proulx effectively controls a majority of the votes through proxies, Proulx effectively can block any sale of an entire Property.

104. Selling Defendants control the annual meetings of the investors.

105. Until 2010, Proulx has controlled the Directors of each Association.

106. For a majority of the period of time, through approximately 2009, each Association each year voted Proulx as the President of each Association until 2009.

107. Even if Proulx did not so control the voting, the majority of the owners of interests are "inexperienced and unknowledgeable members of the general public," because Selling Defendants target sales at people without investment expertise, and, often, without any other investment experience.

108. in making sales of the Investments, the Selling Defendants presented that the land in Lancaster (where the Properties are located) would be a very productive "investment," because it was a developing expanding place, and that it is "it is best to buy 'now' so that it could be sold for the most profit."

109. That representation, had already been made prior to the contract formation.

110. At the time of the sale of many of the Investments, the Selling Defendants, and, thereafter, the Defendant Proulx, consistently assured potential purchasers of the Investment that he would manage the property so that they would not have to worry about management or management decisions.

111. The value of my interest in Landbank 008 according to reports received from Mr. Proulx is at best worth 2/3s of the purchase price, but only if I were to be buying a similar interest from Mr. Proulx.

## CERTIFICATE OF MAILING

I hereby certify that on this 21st day of July, 2011, I deposited the foregoing Affidavit in Support of Motion for Partial Summary Judgment into the US Mail, Postage prepaid, addressed to:

Robert A. Koenig
Ryan Kerbow
Alessi & Koenig, LLC
9500 W. Flamigo, Suite 205
Las Vegas, NV 89147

Ralph Stephen Coppola